Filed 1/8/16

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068690 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF047207) |
| FABIAN FLORENCE PEREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Richard A. Erwood, Judge. Reversed and remanded with directions.

Waldemar D. Halka, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Christine M. Levingston Bergman and Meagan J. Beale, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

The law is well established that a criminal defendant's statements to law enforcement officers are "involuntary and inadmissible when the motivating cause of the decision to speak was an express or clearly implied promise of leniency or advantage." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1088.) In this case, during a custodial interrogation of murder suspect Fabian Perez, a police sergeant told Perez that if he "[told] the truth" and was "honest," then, "we are not gonna charge you with anything." The sergeant continued, telling Perez that he was either a "suspect that we are gonna prosecute," or a "witness," and added that Perez had "witnessed something terrible that somebody did." The sergeant followed up this statement by telling Perez that if he was honest and told the truth during the interview, "[Y]ou'll have your life, maybe you'll go into the Marines . . . and you'll chalk this up to a very scary time in your life." Immediately thereafter, Perez stated that he had "some information" and, shortly after that, confessed his involvement in a robbery during which Perez's accomplice killed the victim.

The People charged Perez with first degree murder (Pen. Code, § 187, subd. (a))[1] and alleged that the murder had been committed in the course of a robbery (§ 190.2, subd. (a)(17)). A jury found Perez guilty of first degree murder and found true the

---

[1] Unless otherwise specified, all subsequent statutory references are to the Penal Code.

robbery-murder special-circumstance allegation. The trial court sentenced Perez to life in prison without the possibility of parole.[2]

On appeal, among other claims, Perez contends that the trial court erred in denying his motion to suppress his statements to law enforcement officers. We conclude that Perez's statements were clearly motivated by a promise of leniency, rendering the statements involuntary, and that the trial court thus erred in denying Perez's motion to suppress the statements.[3] The People concede that, if we conclude that Perez's statements should have been suppressed, the judgment must be reversed. We agree and reverse the judgment. The People also concede that there is insufficient evidence to support the robbery-murder special-circumstance finding in light of the California Supreme Court's recent decision in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*). We agree with this concession as well, and conclude that Perez may not be subjected to a robbery-murder special-circumstance allegation at any retrial. (See *People v. Lewis* (2008) 43 Cal.4th 415, 509.)[4]

---

[2]  Perez's accomplice, Christopher Jasso, was tried separately for murder. Jasso's jury found him guilty of murder and the trial court sentenced him to death.

[3]  In part III.B., *post*, we reject Perez's claim that the trial court erred in refusing to dismiss the charges against him on the ground that the prosecutor authorized the interrogating officers to enter into a cooperation agreement with Perez.

[4]  Perez also argues that the trial court erred by permitting the prosecutor to pose numerous leading questions to Manuel Rivera, a recalcitrant witness who refused to answer any of the prosecutor's questions. Perez notes that the questions pertained to the witness's prior statements to the police implicating Perez in the charged offense. Perez argues that, in permitting this questioning, the trial court violated his confrontation rights under *Douglas v. Alabama* (1965) 380 U.S. 415 (*Douglas*) and its progeny. Although we need not address this claim in light of our reversal of the judgment on other grounds, we reach the issue in part III.D., *post*, because we conclude that the trial court committed

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *The robbery and murder*

On the night of September 6, 2003, victim Carlos Cuellar Cardona was driving a taxi van in Indio.  Just after midnight, William Blackburn was standing outside his stepdaughter's residence on Aztec Street in Indio.  Blackburn saw a taxi van, later determined to be Cardona's, drive north past his stepdaughter's residence, make a U-turn, and park on the side of the street for a short time.  The taxi then drove south on Aztec.  A dark colored Nissan Maxima followed the taxi van as it drove south on Aztec past Blackburn.  Blackburn heard a "pop."  Although his view was partially obstructed, Blackburn could tell that the taxi had stopped just down the street.  A few minutes later, as Blackburn, his stepdaughter, and her boyfriend, drove away from Blackburn's stepdaughter's residence, they saw a body lying in the middle of Aztec Street.  The taxi van was stopped near the intersection of Aztec and Avenue 44, about 40 to 50 feet away from the body.  The group returned to the stepdaughter's residence and called 911.

Authorities found Cardona lying in the road with his face turned to the side and blood pooling around his head.  Cardona had suffered two close-range gunshot wounds to the head and his wallet was missing.  Cardona died from the gunshots.

serious error in allowing the questioning and want to ensure that this error does not recur in a retrial.

Finally, in light of our reversal of the judgment, we need not, and do not, address Perez's claim that the prosecutor committed misconduct during his closing argument or that the cumulative error doctrine applies, because neither issue is likely to recur on remand.

B.    *The investigation*

Responding officers found a .25 caliber shell casing on the driver's seat of the taxi van and a second .25 caliber shell casing in the street.  Police later found Christopher Jasso's fingerprints on a newspaper left on the seat behind the driver's seat.  Investigators also discovered that Jasso was depicted with Cardona's taxi van on a video recorded by a convenience store surveillance camera near the site of the murder, just minutes before the murder.  On the video, Jasso is seen walking into the store, going to the counter, leaving the store, and walking back to Cardona's taxi van.

Jasso lived with his girlfriend, Dolores Pinela (Dolores), Dolores's brother, Benjamin Pinela (Pinela), Dolores's mother, and Dolores's mother's husband, Jack Duke.  On September 6, the day leading up to the murder, while at the family residence, Duke saw Pinela hand Jasso something shiny that looked like a gun.  Jasso then left the family residence in a dark car.  Duke thought that Pinela got the gun from Manuel Rivera.  Duke later asked Rivera why he gave Pinela a gun.  Rivera did not answer.  Pinela and Rivera both told Duke that Jasso had gotten the gun "dirty" and that it had been thrown into the Salton Sea.

Police conducted several searches of Jasso's residence during which they found a wallet matching the description of the victim's wallet, shorts that matched the shorts Jasso was wearing in the surveillance video recorded just before the murder, and two spent .25 caliber shell casings.  A criminalist determined that the shell casings found at Jasso's residence and those found at the crime scene had all been fired from the same gun.

5

C.    *Rivera's statements to police*

Almost three months after the murder, in December 2003, police interviewed Rivera. As discussed in part III.D., *post*, Rivera told police that the gun used in the murder was his and that Perez had confessed his involvement in the robbery to him. As a result of their interview with Rivera, authorities contacted Perez.[5]

D.    *Perez's interview with police officers*

Two days after their interview with Rivera, police conducted a search of Perez's apartment and found marijuana, drug paraphernalia, a scale, and two gun scopes. Police requested that Perez come to the Indio Police Station to be interviewed. Perez agreed and accompanied officers to the station.

Detective Darren Flagg and Sergeant Richard Banasiak of the Indio Police Department conducted the interview. During the initial portion of the interview, Perez repeatedly denied any knowledge of, or involvement in, the crimes. After approximately 25 minutes of questioning during which Perez continued to deny any involvement, Sergeant Banasiak told Perez that if he were to "tell the truth and be honest," then "we are not gonna charge you with anything." Perez responded by telling the officers that he had "some information" and then confessed his involvement in a robbery during which Jasso

---

[5]    As discussed in part III.D., *post*, the People called Rivera as a witness at trial, but Rivera refused to answer any questions and was cited for contempt of court. Among the questions that the prosecutor asked were numerous questions pertaining to the statements that Rivera made to police during his December 2003 interview. In addition, Detective Flagg testified concerning Rivera's statements to police. As discussed in fn. 13, *post*, during Detective Flagg's testimony, the trial court instructed the jury that Rivera's statements were not offered for their truth, but only to show the basis for the actions that law enforcement officers took based on Rivera's statements.

shot and killed Cardona.[6] Perez told the officers that, on the night in question, he agreed to give Jasso a ride in order to assist Jasso in the commission of a robbery. Perez was driving a black Nissan Maxima. After being unable to find a suitable potential victim, Jasso formulated a plan to rob a taxi driver. Jasso planned to call a taxi, and then, during the ride, take money from the driver and run away. Perez would follow behind the taxi in the Maxima and pick up Jasso immediately after the robbery. After briefly discussing the plan, Jasso called a taxi and shortly thereafter, got into a taxi minivan. Perez knew that Jasso had a silver .25 caliber gun in his possession when he got into the taxi. Perez described the route that the taxi van drove, explaining that he followed behind the taxi van in his Maxima.

Perez stated that the taxi van drove down Aztec Street and that after the taxi van performed a U-turn on Aztec Street and headed back toward Avenue 44, he saw the taillights of the taxi van bouncing. Shortly thereafter, Jasso got out of the taxi van, ran down Aztec and turned onto a side street. Perez followed Jasso and picked him up. Jasso had the gun and a black wallet in his hand. Jasso looked through the wallet, gave Perez $100, and kept the rest, about $200. Jasso told Perez to take the gun completely apart and throw it into a dumpster. Perez did so the following day.

After the interview, Perez got into a car with Detective Flagg, Sergeant Banasiak and an investigator from the district attorney's office, and showed them the route that he drove on the night of the murder. During the ride, Perez repeated his description of the

6      In part III.A., *post*, we discuss in detail the circumstances of the interview leading to Perez's confession.

events of the robbery and murder and explained the details of the crime as he had during his interview.

Police did not arrest Perez until about five months later, in May 2004.[7]

## III.

## DISCUSSION

A.   *The trial court erred in denying Perez's motion to suppress his statements to police officers; the statements were involuntary because they were obtained pursuant to a promise of leniency*

Perez claims that the trial court erred in denying his motion to suppress the statements he made during his police interview because the statements were obtained as the result of a promise of leniency and therefore, were involuntary as a matter of law. Where, as here, a defendant's statements to law enforcement officers are recorded, the voluntariness of the confession is reviewed de novo. (*People v. Linton* (2013) 56 Cal.4th 1146, 1177 (*Linton*).)

### 1.   *Governing law*

"Both the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial." (*Linton*, *supra*, 56 Cal.4th at p. 1176.) In *People v. Tully* (2012) 54 Cal.4th 952 (*Tully*), the California Supreme Court described the law governing the determination of whether a confession is involuntary because it was obtained pursuant to an express or implied promise of leniency from law enforcement officers:

---

[7]   The parties do not discuss the circumstances leading to the delay between Perez's arrest in May 2004 and his murder trial in the spring of 2014.

" 'In general, a confession is considered voluntary "if the accused's decision to speak is entirely 'self-motivated' [citation], i.e., if he freely and voluntarily chooses to speak without 'any form of compulsion or promise of rewards. . . .' [Citation.]" [Citation.] However, where a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law.' " (*Tully*, *supra*, at p. 985.)

The *Tully* court explained the requisite causal connection between the promise and the confession as follows:

" 'A confession is "obtained" by a promise within the proscription of both the federal and state due process guaranties if and only if inducement and statement are linked, as it were, by "proximate" causation. . . . The requisite causal connection between promise and confession must be more than "but for": causation-in-fact is insufficient.' [Citation.] 'This rule raises two separate questions: was a promise of leniency either expressly made or implied, and if so, did that promise motivate the subject to speak?' [Citation.] To answer these questions ' "an examination must be made of 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' " ' " (*Tully*, *supra*, 54 Cal.4th at pp. 985-986.)

2. *Factual and procedural background*

a. *Perez's statements to police officers*

As noted in part II.D., *ante*, Detective Flagg and Sergeant Banasiak conducted an interview of Perez. At the outset, Sergeant Banasiak stated that Perez had been cooperative and suggested that if he continued to cooperate, he would be allowed to go home at the end of the interview:

"[Sergeant Banasiak]: . . . When you and I talked at the very beginning, when we went to your house[,] you said, um, am I going down or going wherever I'm going in, [*sic*] and I told you, if you didn't do anything wrong, you're not going anywhere. Didn't I tell you that?

"[Perez]: Yeah.

"[Sergeant Banasiak]: I believe that, [Detective Flagg] believes that. You had little issues down at, at your home, you were up front with us, we're going to ask you about that, you stay with your cooperation, I don't think it's going to be a problem. And then we'll ask you some questions about what we're investigating, and I don't see why you won't go home."

9

After being advised of his *Miranda*[8] rights, Perez agreed to speak with the officers. Sergeant Banasiak began the interrogation by asking Perez about the contraband found in his apartment. After a brief period of questioning concerning this topic, Sergeant Banasiak told Perez that the main reason that police had searched his apartment was because they were investigating a homicide. Banasiak told Perez that the investigators had obtained fingerprints, videotapes and other evidence pertaining to the crime, and that Perez's "name came up in the homicide." Sergeant Banasiak stated that police did not believe that Perez had committed the homicide.

Sergeant Banasiak explained to Perez that the information that police had obtained indicated that Perez was "there when it happened but you didn't do it." Banasiak also told Perez, "We don't want you. We're not after you." Banasiak explained, "We would just assume [*sic*] give you the benefit of the doubt." Banasiak continued by saying that he wanted Perez's "cooperation," and told him, "I don't want you to go to jail for murder. Okay. I don't want you to ruin your life." Banasiak then told Perez, "We're trying to give you the chance to save yourself."

Sergeant Banasiak proceeded to explain that police did not believe that Perez had shot the victim and that the evidence suggested that Jasso had committed the shooting. However, Banasiak explained that it was likely that Jasso would blame Perez for the killing and suggested that Jasso may have already done so. Sergeant Banasiak continued:

> "I want you to think about that because the military is still a possibility. You can go home today. I'm telling you, you can go home today. You can live the life that you want to live. You put yourself in a situation, somebody acted inappropriate, something really

---

[8]    (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).)

bad happened, I don't think you were part of that, but it happened. And now you've got to decide Fabian, where you're at. You can't sit over there, you can't sit over here, you're either going to be on this side with [Jasso] or you're going to be on this side for yourself."

After Perez continued to deny any knowledge of the homicide, Sergeant Banasiak falsely told Perez that police had found his fingerprints in the taxi van and that Perez was depicted on a store's security video that was recorded shortly before the victim was killed. Banasiak continued to pressure Perez to speak to the officers by telling Perez that "[l]egally it's your way out," and "[m]orally it's your way out," and "[t]o God and you ethically, right and wrong is your way out."

Shortly after this exchange and approximately 25 minutes after Perez first denied his involvement in a homicide, the following colloquy occurred:

> "[Perez]: Explain to me what will happen if this case went through and what will happen, if, let's say, it did.
>
> "[Sergeant Banasiak]: Oh, it's gonna go through.
>
> "[Perez]: Okay, then what would happen?
>
> "[Sergeant Banasiak]: Honestly, I am not a lawyer, and I am not going to tell you that, but I'll tell you where we're at with this to be honest with you. Here– here's our posture, and we talked about this earlier. Our posture is this: if you do what I think you should do and tell the truth and be honest, then I –what I told you earlier Fabian– will work, and this is what's going to happen: you're gonna be honest, you are gonna answer the questions we want you to answer, you're gonna be– tell the truth, ok?
>
> "[Perez]: Mm-hm.
>
> "[Sergeant Banasiak]: And we are not gonna charge you with anything. Simply that's it. Now, I'll be honest with you. Remember I told you about the line that you are on? On this side, you're a suspect that we are gonna prosecute. On this side, you're a witness. Do you understand? You witnessed something terrible that somebody did. That's where we want you to be. That's how it goes. There's no other way. You're in, the sad part about, is you're in a bad position because there's all these things go [*sic*] on, but we don't have any other places for you. There's no other positions for you. Right, [Detective Flagg]?
>
> "[Detective Flagg]: That's right. Either one side or the other.
>
> "[Sergeant Banasiak]: And sadly to say, the person who put you in that situation, okay, maybe a little a smoke, maybe a little whatever, I want you to be here. I gave you my word this morning and I am going to give it to you again. You be honest, you tell the truth, you tell us– the way it's supposed to be, as far as I can see, you're gonna go home at

11

the end of the day. You'll, you'll have your life, maybe you'll go into the Marines like you will, and you'll chalk this up to a very scary time in your life.

"[Perez]: Look, I'm going to be honest with you guys. I do have some information. I do have some information, but I had nothing to do with that fucking murder. I didn't pull no fucking trigger[.] It was a surprise, shit went to hell, and I didn't– quite frankly I was at the wrong place at the wrong time."

Perez then told the investigators about the planned robbery of the taxi driver, his having acted as Jasso's getaway driver, Jasso's unexpected shooting of the driver, and Perez's subsequent disposal of the gun that Jasso had used to commit the murder, as described in part II.D., *ante*.

After Perez admitted to assisting Jasso in the robbery and disposing of the gun, Sergeant Banasiak told Perez that Jasso might still attempt to blame him for the killing. Sergeant Banasiak added:

"The only way that you're ever going to be, even have a chance with this, whenever, whoever decides what they're going to do with you and what they're not going to do with you, is if you're honest and up front. That includes everything. Do you agree?"

Perez responded, "Un-huh."

Later during the interview, Sergeant Banasiak told Perez:

"The district attorney– and this, this [is] what I was going to tell you, you're either here, witness, suspect here. Okay. Don't ever forget whatever they ask and do and decide because they have the ultimate power of saying, okay, there, there's robbery issues that was [sic] potentially involved here and you have some place in that. Ultimately somebody died. So you want to stay on this side with your behavior and attitude. Do you agree?"

Perez responded," I understand, yeah, I agree."

As discussed in part II.D., *ante*, immediately after his interview, Perez agreed to go for a car ride, together with Detective Flagg, Sergeant Banasiak and an investigator from the district attorney's office, to several locations at which significant events took place on the night of the murder. At the outset of the ride, Sergeant Banasiak asked Perez

12

why he was agreeing to cooperate with the investigators.  Perez responded, "Because an innocent man died—shouldn't have died."  Toward the beginning of the ride, Sergeant Banasiak told Perez that the district attorney would make the decision as to how to proceed and advised Perez to continue cooperating because "that makes it easier for them to decide how they're going to handle you and your case."  During the ride, Perez described the events that had occurred at the various locations and repeated his confession.

b.      *Perez's motion to suppress his statements*

As noted in part I., *ante*, the People charged Perez with first degree murder (§ 187, subd. (a)) and alleged that the murder was committed in the course of a robbery (§ 190.2, subd. (a)(17)).  Prior to trial, Perez filed a motion to suppress the statements he made to law enforcement officers during the interview and ride-along on the ground that the statements were involuntary.  In support of this contention, Perez argued that his confession was obtained through a promise of leniency.  Perez emphasized that he had repeatedly denied any knowledge of, or involvement in, the homicide until immediately after Sergeant Banasiak promised that he would not be charged if he was honest and told the truth.

The People filed an opposition to the motion to suppress in which they argued that the totality of the circumstances supported the conclusion that the Perez's confession was voluntary.  With respect to Sergeant Banasiak's statement that "we are not gonna charge you," the People argued that "[t]he 'we' cannot reasonably be viewed to include the

13

[district attorney's] [o]ffice [and] as the interview continues this understanding is made clear by both parties."

        c.     *The trial court's ruling on the motion to suppress*

After further briefing, and oral argument, the trial court denied the motion, reasoning:

> "[T]he officers made it clear that the ultimate decision was going to come from the district attorney's office.  And they also told [Perez] during the interview, before he made any admissions, that basically they're – you know, . . . – they didn't just grab him off the street to talk to him. They already had information about his involvement.  They might not have used those words, but they said, "We know what happened."  And that's when he started moving towards talking about the – about the event.  [¶] The fact that on multiple occasions they made clear to [Perez] that it was the District Attorney that made the decision on whether or not he would be charged, I find that that wasn't misleading. That was, in fact, what happened.  [¶]  And so I'm going to deny [the] motion."

        d.     *Perez's statements to law enforcement officers are played for the jury at trial*

At trial, the People played both the audio recording of Perez's interview with Detective Flagg and Sergeant Banasiak described above[9] and the video and audio recording of Perez's ride with law enforcement officers during which Perez repeated his confession and described the events that occurred at the various locations on the night of the murder.

        3.     *Application*

During his interview with Detective Flagg and Sergeant Banasiak, Perez denied any knowledge of the murder for  approximately 25 minutes, until Sergeant Banasiak told him that if he were to "tell the truth and be honest," then "*we are not gonna charge you with anything*."  (Italics added.)  Sergeant Banasiak then told Perez that he was either a

---

9     The audio that was played at trial contained minor redactions that are not relevant to the issue on appeal.

"suspect that we are gonna prosecute," or a "witness." The sergeant emphasized that he was giving Perez his "word," and that Perez could have his "life" if he were to cooperate. Immediately after Banasiak made these statements, Perez responded that he "d[id] have some information," and proceeded to confess his involvement in the crimes. In light of these facts, there can be no doubt that Sergeant Banasiak made an express promise of leniency that was a motivating cause of Perez's confession. Accordingly, the confession must be suppressed. (See *Tully*, *supra*, 54 Cal.4th at p. 985 [" 'where a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law' "]; *People v. Vasila* (1995) 38 Cal.App.4th 865, 875 [concluding confession was involuntary where "defendant was given bald promises that, if he provided the necessary information, he would not be prosecuted federally and would be released from custody"]; *U.S. v. Lall* (11th Cir. 2010) 607 F.3d 1277, 1287 ["It is inconceivable that [the defendant], an uncounseled twenty-year-old, understood at the time that a promise by [a police detective] that he was not going to pursue any charges did not preclude the use of the confession in a federal prosecution"]; compare with *People v. Carrington* (2009) 47 Cal.4th 145, 174 [concluding confession was voluntary where "[t]he statements made by the officers *did not imply* that by cooperating and relating what actually happened, *defendant might not be charged with*, prosecuted for, or convicted of the murder" (italics added)].)[10]

---

[10]    During Perez's trial, defense counsel asked Detective Flagg whether the

15

The People's arguments to the contrary are not persuasive. The People begin by arguing, "Substantial evidence supports the trial court's ruling." However, our review is de novo. (*Linton*, *supra*, 56 Cal.4th at p. 1177 ["The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review."])

The People note that in finding Perez's statements to be voluntary, the trial court relied on the fact that Sergeant Banasiak told Perez that the district attorney would make the ultimate decision with respect to whether he would be charged. This argument is unpersuasive because Banasiak did not make this statement to Perez until *after* he had elicited the incriminating statements from Perez based on the promise that Perez would not be charged. Statements made to Perez *after* he confessed cannot be causally related to his decision to confess. (See *Tully*, *supra*, 54 Cal.4th at p. 985 [court must examine "causal connection between promise and confession," in determining voluntariness].) Further, the fact that Perez did not immediately object to Sergeant Banasiak's statements that the district attorney would make the ultimate charging decision does not render his statements voluntary. Perez's failure to object at this juncture is most reasonably attributable to Perez attempting to continue to cooperate with the officers after having confessed, and not as reflecting Perez's understanding that Sergeant Banasiak had

statement—" 'We're not going to charge you with anything' "—was a "ruse." Detective Flagg responded in the affirmative. Defense counsel then asked, "And that's when Mr. Perez started telling you what he knew?" The detective responded, "Yes." Thus, Detective Flagg recognized that Sergeant Banasiak had made a false promise of leniency in order to elicit information from Perez, and that this statement caused Perez to confess to his involvement in the crime.

16

promised him only that the *police* would not charge him, but that the *district attorney* might. This interpretation is reinforced by the fact that just after telling Perez that "*we are not gonna charge you with anything*," Sergeant Banasiak told Perez that if he did not cooperate he would be a "suspect that *we* are gonna prosecute," implying that "we" referred to both the police and the prosecutor. (Italics added.) Perez would reasonably have understood Sergeant Banasiak's statements as a promise that Perez would not be charged or prosecuted if he were to cooperate with the officers.

The People also note that the trial court suggested that Perez confessed after the officers referred to, in the People's words, "the evidence mounting up against him." This argument is not supported by the facts. The transcript of the interview plainly demonstrates that Perez denied knowledge of the murder, even after the officers told him, *falsely*, that his fingerprints had been found in the van and that he was depicted on security videos recorded shortly before the murder. Perez continued to deny any knowledge of, or involvement in, the crimes until immediately after Sergeant Banasiak told him that if he cooperated and told the truth, he would not be charged.

The People also contend that the "circumstances of the interview and the personal characteristics of [Perez]," support the conclusion that the confession was voluntary. In support of this contention, the People note that Perez had completed high school and that there was no "deprivation of food or sleep." True enough. But falsely promising a defendant that he *will not be charged with a crime*, in order to elicit a confession, renders that confession involuntary even when the defendant is well-educated, rested, and fed. In short, the fact that other circumstances that might render a confession involuntary are not

17

present in this case does not demonstrate the legality of the confession that was obtained through a false promise not to charge the suspect.

The People also argue that Perez's statement that he was cooperating with the police officers because "an innocent man died," demonstrates that Sergeant's Banasiak's promise of leniency was not the motivating cause of Perez's confession. However, Perez made this statement well *after* he made his initial confession—a confession that was immediately preceded by the sergeant's false promise of leniency. Thus, Perez's statement that he was cooperating with police because an innocent man died does not demonstrate the lack of "an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess." (See *Tully*, *supra*, 54 Cal.4th at p. 985.)

The People also note that a confession may be deemed voluntary despite the fact that law enforcement officers emphasize the moral and psychological benefits of confessing (*People v. Carrington*, *supra*, 47 Cal.4th at pp. 171-172), encourage a defendant to tell his "side" of the story (*People v. Hensley* (2014) 59 Cal.4th 788, 812), or promise to intercede with the district attorney on the defendant's behalf (*People v. Jones* (1998) 17 Cal.4th 279, 297-298). The People contend that, similarly, in this case, the officers "properly encouraged [Perez] to tell his side of the story so that a *charging recommendation* could be made to the prosecutor." (Italics added.) This contention grossly misrepresents what Sergeant Banasiak actually said. Sergeant Banasiak told Perez,"[W]e are not gonna charge you with anything. Simply that's it." The sergeant did far more than simply exhort Perez to tell the truth and promise to make a charging

18

*recommendation* to the prosecutor. He clearly promised Perez that Perez would not be charged with a crime.

Finally, the People suggest that Sergeant Banasiak's promise was merely one "not [to] file charges against [Perez] *at that time*." (Italics added.) We reject this argument because Sergeant Banasiak's promise was unqualified, and was followed by statements to the effect that if Perez were to cooperate, he would be able to "have [his] life," that he could potentially "go into the Marines," and that he could "chalk this up to a very scary time in your life." Under these circumstances, no reasonable person would understand Sergeant Banasiak's unqualified promise not to charge Perez as meaning that the sergeant was merely promising not to charge Perez on the day of the interview.

Accordingly, we conclude that the trial court erred in denying Perez's motion to suppress his statements to law enforcement officers.

4. *The error requires reversal*

The People concede that if this court "finds that [Perez's] pretrial statement was admitted erroneously, it must reverse the conviction." We agree. Perez's statements constituted the only evidence directly linking him to the robbery and murder. Accordingly, the improper introduction of such statements constitutes prejudicial error under any standard of prejudice and the judgment must be reversed.

B. *The trial court did not err in refusing to dismiss the case on the ground that the prosecutor authorized a cooperation agreement between Perez and law enforcement*

Perez contends that the trial court erred in denying his motion to dismiss the case on the ground that the prosecutor authorized a cooperation agreement providing that law

19

enforcement officials would "not . . . prosecute Perez in exchange for Perez's truthful statements about the events surrounding the taxi driver's homicide . . . ." We review de novo whether the prosecutor authorized such a cooperation agreement. (*People v. C.S.A.* (2010) 181 Cal.App.4th 773, 778 (*C.S.A.*) ["when a cooperation agreement embraces a promise to dismiss or reduce charges, whether the promise is authorized and enforceable usually is a legal question reviewed de novo"].)

1.      *Governing law*

A cooperation agreement generally involves "an agreement between a defendant and a law enforcement agency." (*C.S.A.*, *supra*, 181 Cal.App.4th at p. 778.) "As with a plea agreement, '[t]he government is held to the literal terms of [a cooperation] agreement . . . . And, like a plea agreement, 'an agreement to cooperate may be analyzed in terms of contract law standards.' " (*Id.* at pp. 778-779.)

However, and of particular importance to this case, " '[a] defendant who seeks specifically to enforce a promise, whether contained in a plea agreement or a freestanding cooperation agreement, must show . . . that the promisor had *actual authority* to make the particular promise . . . .' " (*C.S.A.*, *supra*, 181 Cal.App.4th at p. 779, italics added.)[11] In California, "state and local *prosecutors* are invested with the prosecutorial power of the state." (*Id.* at p. 783, italics added.) "And just as federal law enforcement officers have

---

[11]     The *C.S.A.* court explained that "there is a 'narrow' exception to this requisite showing, where failure to enforce an *unauthorized* cooperation agreement would render the prosecution 'fundamentally unfair.' " (*C.S.A.*, *supra*, 181 Cal.App.4th at p. 779.) However, for reasons that we explain in footnote 12, *post*, we need not consider whether the conditions necessary for the applicability of this narrow exception for *unauthorized* cooperation agreements are met in this case.

20

no independent authority to make promises about the filing and prosecution of federal criminal charges, state and local law enforcement officers have no independent authority to make promises about the filing and prosecution of state criminal charges." (*Ibid.*) Thus, in order to enforce a cooperation agreement in California, the defendant must show that a state or local prosecutor authorized the agreement, thereby granting the law enforcement officer " 'actual authority' " to enter into the agreement. (*Id.* at p. 779; see also *id.* at p. 784 [concluding that trial court erred in dismissing charges based on law enforcement officer's " '*apparent authority*' " to enter into cooperation agreement], italics added.)

    2.    *Factual and procedural background*

    Prior to trial, Perez filed a motion to dismiss the case on the ground that the prosecutor authorized Sergeant Banasiak and Detective Flagg to enter into a cooperation agreement with him pursuant to which Perez agreed to discuss the events related to the robbery and murder in exchange for an agreement not to charge him with any crime. In support of this contention, Perez lodged a transcript of his interview with Sergeant Banasiak and Detective Flagg discussed in part III.A.2., *ante*; notes of a defense investigator concerning his interviews with Sergeant Banasiak and Detective Flagg regarding the circumstances of the officers' interview of Perez; and Detective Flagg's case report summarizing the investigation.

    The People filed an opposition in which they contended that there was no evidence that Perez had entered into any cooperation agreement with law enforcement officers and

that there was no evidence that the prosecutor had authorized any such agreement. The trial court denied Perez's motion.

3. *Application*

The only evidence that Perez cites in support of his contention that the *prosecutor* authorized the police officers to enter into a cooperation agreement with Perez are Sergeant Banasiak's statements to a defense investigator that Deputy District Attorney Patricia Kelly authorized that "Perez be treated as a witness instead of a suspect" and that Kelly insisted that Perez be provided with *Miranda* warnings prior to his interview. Perez speculates that Deputy District Attorney Kelly "anticipated that Perez would make incriminatory statements and that he would be waiving his right to counsel and his right against self incrimination in exchange for the cooperation promise not to treat him as a suspect."

We are not persuaded. Evidence that Deputy District Attorney Kelly agreed with investigators that Perez be treated as a witness during an interview and insisted that that Perez be admonished pursuant to *Miranda* falls far short of demonstrating that the prosecutor authorized Sergeant Banasiak to promise Perez that he would not be charged with any crime in exchange for Perez's truthful statements concerning the events surrounding the robbery murder. Perez also notes in his brief that Deputy District Attorney Kelly sent two investigators from her office to "monitor . . . and assist" Detective Flagg and Sergeant Banasiak with their interview of Perez. However, Perez makes no argument with respect to the significance of this fact. In any event, there is nothing in the record that suggests that the investigators from the district attorney's office

22

influenced the interview in any way, much less that the investigators authorized a cooperation agreement between law enforcement officials and Perez. We therefore conclude that the trial court did not err in refusing to dismiss the case on the ground that the prosecutor authorized a cooperation agreement between Perez and law enforcement officials.[12]

C.      *There is insufficient evidence to support the robbery-murder special-circumstance true finding*

Perez contends that there is insufficient evidence to support the robbery-murder special-circumstance true finding (§ 190.2, subd. (d)). The People concede that under *Banks*, *supra*, 61 Cal.4th 788, the evidence is insufficient to support the finding.

---

[12]     We need not consider whether there was breach of an *unauthorized* cooperation agreement with Perez. "[T]he remedy for breach of an unauthorized cooperation agreement usually is a sanction short of dismissal." (*C.S.A.*,181 Cal.App.4th at p. 780, citing, inter alia, S*tate of North Carolina v. Sturgill* (1996) 121 N.C.App. 629 [469 S.E.2d 557, 568-569] [concluding exclusion of evidence, rather than dismissal of charges, was proper remedy for defendant's reliance on unauthorized cooperation agreement and stating, "[W]e are not required, as a result of the 'constable's blunder,' to place defendant in a better position than he enjoyed prior to making the agreement with the police"].)
      We concluded in part III.A., *ante*, that Perez's statements to law enforcement officers must be suppressed as the product of a false promise of leniency. Perez does not contend that he is entitled to some remedy beyond suppression based on the alleged breach of an *unauthorized* cooperation agreement in this case. Accordingly, even assuming, strictly for the sake of argument, that there was a breach of an unauthorized cooperation agreement in this case, we agree with Perez that "exclusion of Perez's statements rather than dismissal of the criminal charges is the appropriate remedy," under the circumstances of this case. Since we have already concluded that Perez's statements must be suppressed in connection with his involuntary confession argument (see pt. III.A., *ante*), we need not consider whether there was in fact a breach of an unauthorized cooperation agreement because Perez would be entitled to no greater remedy than suppression of his statements for such a breach.

23

In *Banks*, as in this case, a jury found the defendant guilty of first degree murder under a felony-murder theory and found true a felony-murder special circumstance. (*Banks*, *supra*, 61 Cal.4th at p. 794.) The *Banks* court concluded that evidence that the defendant had acted as a getaway driver for an armed robbery during which the defendant's accomplice shot and killed a victim was insufficient as a matter of law to support a robbery murder special circumstance. (*Ibid.*) After reviewing United States Supreme Court case law on which section 190.2, subdivision (d) is based, the *Banks* court reasoned that evidence that the defendant acted as the getaway driver did not establish that the defendant had acted " 'with reckless indifference to human life and as a major participant' " in the felony resulting in death (§ 190.2, subd. (d)), as is required. (*Banks*, *supra*, at p. 794.)

We accept the People's concession and conclude that there is insufficient evidence to support the robbery-murder special-circumstance finding under *Banks*. Thus, Perez may not be subjected to a robbery-murder special-circumstance allegation at any retrial. (See *People v. Lewis*, *supra*, 43 Cal.4th at p. 509 ["Because sufficient evidence does not support the lying-in-wait special-circumstance allegation, retrial of that allegation is barred."].)

D.    *If the case is retried and Rivera refuses to answer the prosecutor's questions, the trial court shall not permit the prosecutor to pose leading questions to Rivera in front of the jury pertaining to Rivera's prior statements to police*

Perez claims that the trial court erred in permitting the prosecutor to pose leading questions to Rivera in front of the jury pertaining to Rivera's prior statements to police, when the prosecutor knew that Rivera would refuse to answer any questions. Although

24

we need not address this claim in light of our reversal of the judgment on other grounds, we consider the issue because it may recur on remand.[13]

 1.  *Factual and procedural background*

  a.  *Proceedings outside the presence of the jury*

Prior to trial, Perez orally moved to exclude the statements that Rivera made to the police. The court deferred ruling on the motion, with the anticipation of conducting a hearing for the purpose of determining whether Rivera would testify at Perez's trial. During a subsequent hearing, outside the presence of the jury, Rivera was sworn as a witness and testified that he would not answer any of the prosecutor's questions. The trial court held Rivera in contempt of court and ordered him "back to the jail."[14]

During the trial, outside the presence of the jury, the court held a hearing for the purpose of determining the manner by which it would permit the prosecutor to examine

---

[13] Perez also claims that the trial court prejudicially erred in permitting Detective Flagg to testify concerning Rivera's statements for the purpose of explaining Detective Flagg and Sergeant Banasiak's states of mind in interviewing Perez. Specifically, during his cross-examination of Detective Flagg, defense counsel asked the detective whether the officers had lied to Perez when they told him that he was seen on a surveillance video and that his fingerprints were found inside the taxi van. On redirect, the trial court permitted the prosecutor to ask Detective Flagg questions concerning Rivera's statements in an attempt to demonstrate that the officers had a good faith basis for the questions that they asked Perez. The court instructed the jury that Rivera's statements were not offered for their truth, "just that those words were communicated to law enforcement officers and, based upon that communication, they did certain things."

 We need not consider whether the trial court erred in admitting Rivera's statements for this purpose. Rivera's statements clearly will not be admissible during any retrial to demonstrate the officers' states of mind in interviewing Perez because we have concluded that Perez's statements to the officers must be suppressed.

[14] It appears that Rivera was in custody on an unrelated matter.

Rivera in front of the jury. The prosecutor requested that he be "allowed to put questions" to Rivera because Rivera might decide to answer the prosecutor's questions.

The court stated, "I think you have the right to ask specific questions and ask all the questions you want, and he doesn't even take the Fifth because he doesn't have the Fifth Amendment privilege [against self-incrimination]. So he just refuses to answer and I hold him in contempt."[15]

Defense counsel objected to the proposed procedure. Counsel stated that he had no objection to the prosecutor asking a few preliminary questions, but that no questions should be asked beyond those needed to establish that Rivera would not provide any substantive testimony. Defense counsel argued that it would be "terribly prejudicial for Mr. Perez to allow [the prosecutor] to basically state his . . . case as to what he expects the witness to say, parade it before the jury." Defense counsel maintained that such a procedure would violate Evidence Code section 352[16] and noted that he would not be

[15] During this hearing, the prosecutor stated that Rivera was "not charged with anything," and "I think we've established he doesn't have any Fifth Amendment privilege." It is unclear from the record why Rivera did not have a Fifth Amendment privilege, given the evidence suggesting his possible involvement in the robbery and murder. However, Rivera did not assert a Fifth Amendment privilege at trial and Perez raises no assertion with respect to this issue on appeal. Thus, we assume for purposes of our analysis that Rivera did not have such a privilege. To the extent that Rivera in fact had a Fifth Amendment privilege not to testify, it would be "improper to require him . . . to invoke the privilege in front of a jury; such a procedure encourages inappropriate speculation on the part of jurors about the reasons for the invocation." (*People v. Morgain* (2009) 177 Cal.App.4th 454, 466 (*Morgain*).)

[16] Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

able to cross-examine Rivera. Defense counsel argued further that to allow the prosecutor to "relat[e] all these statements," would be "very unfair to the defense."

The court ruled that the prosecutor "should be given the opportunity to go into all the questions he wants to see if [Rivera will] answer any of them." After defense counsel asked for clarification as to how many questions the court would allow, the trial court responded that defense counsel would be able to raise an objection and that "if they become repetitive or we're going over the same question about the same subject matter that has already been addressed, then you know you'll probably have a good objection."

b. *Proceedings before the jury*

The People called Rivera as a witness. After being sworn, Rivera gave his name, but refused to answer any of the prosecutor's questions. The trial court permitted the prosecutor to treat Rivera as a hostile witness and ordered Rivera to answer the prosecutor's questions concerning the statements he had made to the police, over defense counsel's repeated objections. The court held Rivera in contempt for each refusal to answer.

For example, the prosecutor asked, "Mr. Rivera, on December 16th, 2003, were you at the Indio Police Department?" Rivera refused to answer the question, and the court held him in contempt.

The prosecutor then asked, "Mr. Rivera, did you tell . . . Detective Sergio Carrillo on December 16th, 2003, that it was your gun, a .25 caliber, that killed the taxi cab driver?"

27

Defense counsel stated, "[A]t this point I'm going to object to this line of questioning. I think it's clear the witness is refusing to answer, and he's therefore unavailable for that line of questioning, and I would object to this line of questioning." The court overruled the objection.

Following this objection, a similar pattern of questioning continued, with the prosecutor asking Rivera numerous questions about the statements he had made to police. Among the questions that the prosecutor asked were whether Rivera had told police that: (1) he had left the murder weapon with Pinela when Rivera had gone to Arizona two weeks before the shooting; (2) his "best friend" Perez warned him not to return from Arizona because the police were serving search warrants; (3) Perez told him what had occurred on the night of the homicide; (4) Perez told him that on the night leading up to the murder, he made plans with Jasso to rob somebody because they needed money; (5) Perez told him that Perez and Jasso made a plan to rob the taxi driver; (6) Perez told him that after the robbery, Jasso gave Perez $80 and Jasso kept the taxi driver's wallet; (7) Perez told him that Perez kept the gun and disposed of it; and (8) Rivera's gun was a .25 caliber and chrome and shiny in color. Rivera refused to answer all of the questions.

In addition, during his questioning of Rivera, and over defense counsel's objection, the prosecutor showed Rivera a transcript of his statements to police and asked him whether the transcript refreshed his recollection concerning the statements he had made to police. Rivera refused to answer.

After the prosecutor completed his questioning, defense counsel stated that he had no questions for Rivera. The court then instructed the jury that the prosecutor's unanswered questions did not constitute evidence.

2.      *Governing law*

In *Douglas*, *supra*, 380 U.S. 415, the United States Supreme Court held that a trial court violated a defendant's right to confrontation by permitting a prosecutor to pose a series of questions to a witness, Loyd, concerning Loyd's prior statement to police, which Loyd refused to answer. (*Id.* at p. 419.) The prosecutor asked Loyd a series of questions concerning the charged crime. (*Id.* at p. 416.) Although Loyd invoked his Fifth Amendment privilege against self-incrimination, the trial court ruled that Loyd had no privilege to invoke and ordered him to answer the prosecutor's questions. (*Ibid.*) Despite the court's order, Loyd continued to refuse to answer any questions. (*Ibid.*) The prosecutor proceeded to read a statement that Loyd had allegedly made to the police in which Loyd inculpated the defendant in firing a shotgun with the intent to murder. (*Id.* at pp. 416, 419.) During his reading of the statement, the prosecutor repeatedly asked Loyd whether he had made the statement. (*Id.* at p. 416.) Loyd refused to answer the questions. (*Id.* at pp. 416-417.)

The United States Supreme Court held that the defendant's inability to cross-examine Loyd as to the statement he allegedly made to the police "plainly denied" the defendant his constitutional right to confrontation. (*Douglas*, *supra,* 380 U.S at p. 419.) The *Douglas* court reasoned in part:

29

"Although the [prosecutor's] reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the [prosecutor's] reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true. . . . [¶] . . . [E]ffective confrontation of Loyd was possible only if Loyd affirmed the statement as his. However, Loyd did not do so, but relied on his privilege to refuse to answer. We need not decide whether Loyd properly invoked the privilege in light of his conviction. It is sufficient for the purposes of deciding petitioner's claim under the Confrontation Clause that no suggestion is made that Loyd's refusal to answer was procured by the petitioner, [citation]; on this record it appears that Loyd was acting entirely in his own interests in doing so." (*Id.* at pp. 419-420.)

California cases have repeatedly relied on *Douglas* to conclude that a defendant's right to confrontation is violated where, in examining a recalcitrant witness, the prosecutor poses leading questions that provide the details of prior statements the witness made to police regarding a defendant's commission of a crime. (E.g., *People v. Murillo* (2014) 231 Cal.App.4th 448, 456 (*Murillo*) [concluding that victim witness's "refusal to answer over 100 leading questions while the prosecutor read to the jury from his police interviews denied [defendant] the opportunity to cross-examine the victim on what was tantamount to devastating adverse testimony"]; *People v. Rios* (1985) 163 Cal.App.3d 852, 864 (*Rios*) ["the admission of a prior statement made by a witness who stonewalls at trial and refuses to answer any question on direct or cross-examination denies a defendant the right to confrontation which contemplates a meaningful opportunity to cross-examine the witness"]; *People v. Shipe* (1975) 49 Cal.App.3d 343, 355 (*Shipe*)["[the prosecutor] succeeded in creating the distinct impression that [the witnesses] had talked to the authorities, that they described the events vividly depicted in the prosecutor's questions and that their statements were true"].)

The *Murillo* court succinctly explained the nature of the error under the circumstances of that case:

30

"A prosecution witness takes the witness stand but refuses to answer any questions. The trial court allows the prosecutor to ask the witness more than 100 leading questions concerning the witness's out-of-court statements to prove defendant guilty of several criminal offenses. The questions create the illusion of testimony. This deprived defendant of a fair trial because he could not exercise his constitutional right of cross-examination. Instructions that cautioned the jury not to regard the prosecutor's questions as evidence did not overcome the extreme prejudice to defendant." (*Murillo*, *supra*, 231 Cal.App.4th at pp. 449-450.)

3.     *On remand, the trial court shall not permit the prosecutor to ask Rivera questions in front of the jury pertaining to his prior statements to police*

In this case, in permitting the prosecutor to pose numerous questions to the recalcitrant Rivera concerning his statements to police, the trial court committed the same error condemned in *Douglas* and its progeny. The prosecutor asked numerous leading questions concerning Rivera's out-of-court statements to the police implicating Perez in the commission of the charged offense in order to prove Perez guilty. Although, as in *Douglas*, the prosecutor's questions and Rivera's refusals to answer were "not technically testimony" (*Douglas*, *supra*, 380 U.S. at p. 419), the questions "create[d] the illusion of testimony" (*Murillo*, *supra*, 231 Cal.App.4th at p. 450), were "tantamount to devastating adverse testimony" (*id.* at p. 456), and clearly violated Perez's right to confrontation.

The People's arguments to the contrary are, at best, not persuasive. The People contend, "There was no confrontation clause violation here because no testimony was provided." This contention is directly contrary to *Douglas*, which, as discussed above, concluded that the trial court violated a defendant's right to confrontation even though the prosecutor's questions and the witness's refusals to answer were "not technically testimony." (*Douglas*, *supra*, 380 U.S. at p. 419.)

The People also contend that *Douglas* and *Shipe* are distinguishable on the ground that in those cases, "the witnesses had a legal justification for not answering questions,

31

having invoked their valid rights against self-incrimination."  This argument is entirely unpersuasive since both the *Douglas* and the *Shipe* courts expressly stated that they need not decide whether a witness had validly invoked the privilege against self-incrimination in ruling on defendant's confrontation clause claim.  (See *Douglas*, *supra*, 380 U.S. at p. 420 ["We need not decide whether Loyd properly invoked the privilege."]; *Shipe*, *supra*, 49 Cal.App.3d at p. 349 [stating that the court was "not concerned" with the trial court's ruling that the witnesses were not entitled to assert their Fifth Amendment privilege]; see also *Murillo*, *supra*, 231 Cal.App.4th at p. 456 [applying *Douglas* and *Shipe* with respect to recalcitrant witness who "did not invoke the privilege against self-incrimination"].)

We are similarly unpersuaded by the People's citation to cases in which courts have concluded that it is proper in a criminal case to allow the prosecutor to call as a witness a person who refuses to answer questions, where the person does not have a valid claim of legal privilege.  (E.g., *People v. Lopez* (1999) 71 Cal.App.4th 1550, 1554 (*Lopez*) [noting that while it is improper to require a witness who has a valid Fifth Amendment privilege to invoke the privilege in front of the jury, "where a witness has no constitutional or statutory right to refuse to testify, a different analysis applies"]; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 151 (*Sisneros*) [citing *Lopez* and concluding trial court did not abuse its discretion in permitting prosecutor to call witness to stand knowing that she would refuse to testify].)  *Lopez* and *Sisneros* are distinguishable from this case because the prosecutors in those cases did not ask the witnesses about their *out-of-court* statements.  (*Lopez*, *supra*, at p. 1554; *Sisneros*, *supra*, at p. 150.)  Thus the defendants' confrontation clause rights under *Douglas* and its progeny were not

32

implicated. In *Lopez*, the prosecutor was permitted only to ask a recalcitrant witness about the witness's commission of a crime, for purposes of establishing a pattern of criminal gang activity. (*Lopez*, *supra*, at p. 1553.) In *Sisneros*, the trial court permitted the prosecutor to call the witness in front of the jury, but did not permit the prosecutor to ask *any* questions. (*Sisneros*, *supra*, at p. 150.) Neither case had any occasion to discuss *Douglas* or the California cases that follow *Douglas*.

A third case, on which the People rely, *Morgain*, *supra*, 177 Cal.App.4th 454, is also distinguishable. In *Morgain*, the prosecutor granted the defendant's girlfriend (Wallace) use immunity, and called her as a witness at the defendant's murder trial. (*Id.* at p. 460.) Wallace testified that she was defendant's girlfriend, the mother of his child, and that she lived with him at the time of the charged offense. (*Ibid.*) Wallace also provided testimony concerning the defendant's whereabouts on the day of the shooting. (*Ibid.*) In addition, Wallace stated that she did not recall talking to police after the incident, and denied having made several statements to the police concerning the defendant's whereabouts on the day of the shooting. (*Id.* at pp. 460-461.) After Wallace provided this testimony, the prosecutor asked her several additional questions about the charged offense, including whether the defendant had confessed to her that he had shot the victim several times. (*Id.* at pp. 461-462.) Wallace refused to answer the questions and the trial court held her in contempt. (*Ibid*.) Later in the trial, defense counsel moved to strike Wallace's testimony in its entirety. The trial court granted the motion. (*Id.* at p. 462.)

On appeal, appellant contended that the "court violated his right of confrontation when it permitted the prosecutor to ask Wallace whether she told police appellant confessed to the shooting." (*Morgain*, *supra*, 177 Cal.App.4th at p. 463.) The *Morgain* court acknowledged that "[a] defendant's confrontation rights may be violated where a prosecutor examines a recalcitrant witness and poses questions that relate to prior statements made by that witness, in circumstances where the witness's recalcitrance effectively prevents cross-examination concerning those prior statements." (*Ibid.*) However, the *Morgain* court concluded that there had been no such violation in that case because the trial court had struck Wallace's testimony in its entirety and had instructed the jury not to consider the prosecutor's questions as evidence, and because there was independent evidence of appellant's guilt. (*Id.* at pp. 465-466.)

*Morgain* is distinguishable for two important reasons. To begin with, unlike Rivera, Wallace *testified* at trial. (See *People v. Dement* (2011) 53 Cal.4th 1, 24 ["unlike the witness in *Douglas* . . . [the witnesses in *Dement*] did not invoke their Fifth Amendment privilege against self-incrimination and refuse to answer any questions about the crime, a circumstance that would have rendered them 'totally unavailable at the trial for any kind of cross-examination' "].) Rather, Wallace answered a number of the prosecutor's questions, and specifically stated that she did not recall making certain statements to the police. She subsequently denied having made the statements at issue. (*Morgain*, *supra,* 177 Cal.App.4th at pp. 460-461; compare with *Rios*, *supra*, 163 Cal.App.3d at pp. 864 -865 [stating that *Douglas* may apply where a witness "*stonewalls* at trial"], italics added.) In addition, the bulk of the prosecutor's questions in *Morgain* did

34

not concern Wallace's *out-of-court* statements to police. (*Morgain*, *supra*, at pp. 459-461.) Rather, the questions sought to elicit testimony concerning the charged offense (*ibid.*), and thus did not violate the defendant's right to confrontation. In this case, in contrast, virtually all of the questions that the prosecutor posed to Rivera concerned Rivera's out-of-court statements to police that implicated Perez in the murder. In short, *Morgain* cannot reasonably be read as permitting a prosecutor to "create the illusion of testimony" by asking a recalcitrant witness about the witness's out-of-court statements to police. (*Murillo*, *supra*, 231 Cal.App.4th at p. 450.)

Accordingly, we conclude that on remand, if Rivera refuses to answer the prosecutor's questions at a retrial, the trial court shall not permit the prosecutor to pose questions to Rivera in front of the jury pertaining to Rivera's prior statements to police.

4. *Rivera's prior statements may not be admitted as prior inconsistent statements in the event that he refuses to testify at a retrial*

The People claim that, to the extent Rivera refuses to testify without legal justification, his prior statements to police should be admissible as prior inconsistent statements pursuant to Evidence Code sections 1235 and 770.[17] This argument is contrary to both California and federal law. In *Rios*, *supra*, 163 Cal.App.3d 852, after

---

[17]    Evidence Code section 1235 provides, "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."
Evidence Code section 770 provides:
> "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless:
> > "(a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or
> > "(b) The witness has not been excused from giving further testimony in the action."

noting that a witness's prior statements are not admissible pursuant to Evidence Code section 1235 where the witness has no recollection of the underlying facts as to which he is being questioned,[18] this court rejected this precise argument:

> "We conclude there is no relevant legal difference between the situation where the stonewalling witness refuses to answer any questions and the situation where the witness totally recalls no facts, for purposes of determining inconsistency under Evidence Code section 1235. In both situations there is simply no 'statement' in the record which is inconsistent, or for that matter consistent, with prior statements; there is no 'express testimony' at all from which to infer or deduce implied inconsistency. [Citations.] [¶] [Evidence Code] [s]ection 1235, by its express terms, requires a witness give testimony from which an inconsistency, express or implied, may be determined. Where, as here, the witnesses give no testimony, there is no evidence to support a finding of inconsistency. [Evidence Code] [s]ection 1235 simply does not apply." (*Rios*, *supra*, at p. 864.)

In *People v. Homick* (2012) 55 Cal.4th 816 (*Homick*), the Supreme Court endorsed the reasoning of *Rios*, explaining that while selectively refusing to answer *some* questions at trial, "expos[es] the witness to impeachment under Evidence Code section 1235" (*People v. Homick*, *supra*, at p. 859), no such impeachment is permissible where the witness refuses to testify at all. (*Id.* at p. 860 ["This is not a case where a witness took the stand and refused to testify at all, thus providing no basis for the trial court to find inconsistency in effect," citing *Rios*, *supra*, 163 Cal.App.3d at pp. 860-861].)

The introduction of Rivera's prior statements under these circumstances would also violate Perez's confrontation clause rights under *Douglas* and its progeny. (See *Rios*, *supra*, 163 Cal.App.3d 852, 864 ["the admission of a prior statement made by a witness who stonewalls at trial and refuses to answer any question on direct or cross-examination

---

18      The *Rios* court noted that a witness's prior statements may be admissible where the "court finds a witness *falsely* claiming failure to remember facts in order to *deliberately* avoid testifying as to those facts." (*Rios*, *supra*, 163 Cal.App.3d at pp. 863-64, italics added.) In such a circumstance there is said to be an "implied" (*id*. at p. 863) inconsistency between the prior statement and the witnesses trial testimony. (*Id*. at pp. 863-864, citing *People v. Green* (1971) 3 Cal.3d 981, 986-989.)

denies a defendant the right to confrontation which contemplates a meaningful opportunity to cross-examine the witness"].)  Thus, on remand, if Rivera refuses to answer the prosecutor's questions at a retrial, the trial court shall not permit the People to introduce Rivera's statements to police pursuant to Evidence Code section 1235.

## IV.

## DISPOSITION

The judgment is reversed.  Perez's conviction for first degree murder is reversed. The robbery-murder special-circumstance true finding is reversed for insufficient evidence.

The People may retry Perez on a charge of murder within the time limit set forth in section 1382, in a manner consistent with this opinion.  Perez may not be subjected to a robbery-murder special-circumstance allegation during any retrial.

The trial court may conduct any necessary ancillary proceedings consistent with this opinion.


AARON, J.

WE CONCUR:

NARES, Acting P. J.

McINTYRE, J.


37