Filed 6/28/18; Opinion following rehearing

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE, | 2d Crim. No. B270903 |
| | (Super. Ct. No. BA425421-02) |
| Plaintiff and Respondent, | (Los Angeles County) |
| v. | OPINION FOLLOWING |
| | REHEARING |
| CHRISTIAN ALMANZA, | |
| Defendant and Appellant. | |

When the retroactive application of a statute gives a trial court discretion to reconsider imposing a lower sentence than one previously imposed, it is the usual custom for an appellate court to remand the case to the trial court. In this opinion on rehearing, *People v. McDaniels* (2018) 22 Cal.App.5th 420 persuades us to follow that custom here.

A jury convicted Christian Almanza of first degree murder (Pen. Code, §§ 187, subd. (a), 189)[1] and assault with a firearm (§ 245, subd. (b)). The jury found gang enhancement allegations

---

Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are identified as those portions between double brackets, e.g., [[/]].

[1] All statutory references are to the Penal Code.

true on both counts.  (§ 186.22, subd. (b)(1)(C).)  On the murder charge, the jury found a principal personally and intentionally discharged a firearm causing death.  (§ 12022.53, subd. (d).)  The trial court found Almanza suffered two prior strike convictions within the meaning of the three strikes law (§ 667, subds. (a)-(i)) and one prior prison term (§ 667.5, subd. (b)).

The trial court sentenced Almanza to an aggregate term of 137 years to life, including 25 years to life for the firearm enhancement imposed pursuant to section 12022.53, subdivision (d).  The court stayed two other firearm enhancements (§ 12022.53, subd. (b) & (c)) pursuant to section 654.

Our Supreme Court granted review of our opinion affirming the judgment (*People v. Almanza* (Sept. 12, 2017, B270903) [nonpub. opn.]) and remanded the matter to us with directions to vacate our opinion and reconsider the cause in light of Senate Bill No. 620.  (*People v. Almanza* (Nov. 29, 2017, S244789).)

We remand so that the trial court may exercise its independent discretion on whether to strike or dismiss the firearm enhancement.  In all other respects, we affirm.

## FACTS

Robert Hernandez and his brother, Jesus, were members of the Big Hazard criminal street gang.  Jesus got into a dispute with a Big Hazard "shot-caller," Robert Gonzalez.  As a result, Jesus shot and killed Gonzalez.  The Big Hazard leadership gave a "green light" to kill Jesus and members of his family, including Hernandez.  A Big Hazard member who fails to carry out a green light is subject to discipline for failure to follow orders.

Almanza was a Big Hazard gang member.  On May 3, 2014, he was at a barbeque attended by other members of his gang.  Hernandez and Anthony Rivas were at the barbeque.  Almanza

2

gave Hernandez money to buy beer and Hernandez left for the store. While Hernandez was gone, Almanza received a phone call from gang leader Victor "Grizzly" Barrios, advising him that Hernandez was in trouble with the gang. Barrios said that Hernandez had pulled a gun on another Big Hazard member for writing graffiti on a wall.

Almanza and Rivas left the barbeque to confront Hernandez at the store. On the way, they stopped by Rivas's house and picked up a .38 handgun. When they arrived at the store, Almanza went inside to see if Hernandez was there. Almanza saw Hernandez and spoke to him briefly. Almanza left the store with Hernandez behind him. When Hernandez came into the store's parking lot, Rivas shot Hernandez twice, killing him. A bystander, Americo Beltran, was struck in the thigh by a stray bullet.

Rivas gave the gun to Almanza. Almanza took the gun to another gang member's house where he left it.

*Surveillance Videos*

Surveillance cameras in and outside the store captured the following:

Almanza and Rivas were walking toward the store. Rivas was several seconds behind Almanza. Rivas appeared to be holding a shiny object in his hand.

Almanza approached the entrance to the store and looked around before entering. He spoke briefly with Hernandez in the store. Almanza walked out of the store with Hernandez immediately behind him.

In the meantime, Rivas entered the store's parking lot. Rivas made a gesture with his hand that Officer Alejandro Feria opined was consistent with someone racking a handgun, but a handgun could not be discerned from the video. Rivas stepped

3

out of the video before the shots were fired.  Hernandez fell to the ground.  Almanza ran away from the store with a shiny object in his hand.

*Cell Phone Texts*

On May 3, between 11:02 p.m. and 11:44 p.m., Almanza made outgoing calls to Barrios, the gang leader who warned him about Hernandez.

On May 4, starting at 12:36 a.m., Almanza received text messages stating:  "Oh my God.  Why?  You are so dumb.  Leave.  Hide.  Are you okay?  Where are you?"  Almanza responded, "I just hope they don't have me on camera" and "I'm sorry Gorda."

At 3:49 a.m., Almanza sent a text message, "I'm good so far, but if I do get busted, tell Diana."  Later Almanza texted, "I fudge [*sic*]  up.  And what can I do?  Just hope everything goes good."  At 6:32 a.m., Almanza texted the same person, "Still here . . . .  Me and [Rivas] drinking.  LOL."  The person responded, "It's going to get hot out there, babe."

At 1:11 p.m., Almanza texted, "Babe, just got a call.  The video blank.  They didn't see me.  Thank God."  Six minutes later Almanza texted, "Gorda.  The video at the store was blank.  I'm okay.  I'm not on it.  Thank God."

On May 11, at 9:58 a.m., Almanza texted, "I did some shit that I got to get out of here.  I'm just waiting to do one big transa [*sic*] and I'm gone."  Two minutes later Almanza texted, "Nobody knows I'm leaving for good, but I'm just gonna ask you once.  You wanna leave with me, but nobody could know.  R-E-A  I'm serious."

*Gang Testimony*

Los Angeles Police Officer Brian Cook testified as a gang expert.  The Big Hazard and the Krazy Ass Mexican gangs were his primary responsibility.  The Big Hazard gang has

4

approximately 360 members. Cook has met more than 80 of them.

Big Hazard's primary activities include murder, attempted murder, voluntary manslaughter, assault with deadly weapons, robbery, burglary, felony vandalism and criminal threats. The gang also is involved in narcotics sales.

Cook testified that Rivas is a Big Hazard gang member. Cook has not personally met Rivas. But Cook identified Big Hazard gang tattoos in a photograph of Rivas.

Cook testified that Almanza is also a gang member. Cook has had numerous personal contacts with Almanza. Almanza admitted to Cook that he is a Big Hazard gang member. He has gang tattoos.

Cook testified that Hernandez was a member of the Big Hazard gang. Cook did not know Hernandez personally, but saw his body at the crime scene. Hernandez's body had Big Hazard tattoos.

The prosecution gave Cook a hypothetical based on the facts of the case. Cook opined the shooting was done for the benefit of, at the direction of, or in association with a criminal street gang.

The prosecution introduced evidence of three predicate offenses.

A certified court docket showed Ryan Zepeda was convicted of two counts of attempted murder with a gang enhancement. Cook testified he had numerous personal interactions with Zepeda during which he admitted his membership in the Big Hazard gang.

Hernandez's brother, Jesus, was convicted of the murder of Robert Gonzalez, the murder that led to the Hernandez family being "green lighted." Cook's knowledge of the murder was based

5

on investigative reports and discussions with the investigator and prosecutor.

Cook testified he personally knew Victor Barrios and knew him to be a member of the Big Hazard gang. Later in the trial Detective Miguel Barajas testified that he served a search warrant on Barrios's residence. He found narcotics, a scale, pay and owe sheets and gang paraphernalia. Barrios was convicted of possession of narcotics for sale.

*Confession*

After the shooting, Almanza voluntarily went to the police station. He was advised of his rights and agreed to talk to the police. The interview was recorded. After giving three false statements, Almanza admitted to his involvement in the murder.

DISCUSSION

I

[[Almanza contends the gang-related charges (§ 186.22, subds. (b)(1)(C)) must be reversed pursuant to *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).

In *Sanchez*, our Supreme Court discussed the role of hearsay in gang expert testimony. *Sanchez* held that a gang expert may rely on hearsay in forming an opinion within his field of expertise. (*Sanchez*, *supra*, 63 Cal.4th at p. 676.) But an expert cannot relate "case-specific facts" about which he has no independent knowledge unless they are independently proven by competent evidence or are covered by a hearsay exception. (*Ibid.*) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid.*)

Section 186.22, subdivision (e) requires the prosecution to prove the commission or attempted commission of at least two predicate offenses listed in that subdivision. Among the offenses

6

listed are unlawful homicide (subd. (e)(3)) and possession of a controlled substance for sale (subd. (e)(4)).

A certified court docket showed Ryan Zepeda was convicted of two counts of attempted murder. Admission of such records is admissible as an exception to the hearsay rule. (Evid. Code, § 452.5, subd. (b).) Officer Cook testified he personally knows Zepeda and Zepeda admitted to him his membership in the Big Hazard gang.

Detective Barajas testified that while executing a search warrant on Barrios's residence, he found narcotics, a scale and pay and owe sheets. Barajas testified Barrios was convicted of possession of a controlled substance for sale. Given that Barajas worked the case, the reasonable conclusion is that he has personal knowledge of the conviction. Cook testified he personally knows Barrios and knows him to be a member of the Big Hazard gang.

Almanza's current charged offense constitutes a third predicate offense. (See *People v. Loeun* (1997) 17 Cal.4th 1, 10 [prosecution may rely on charged offense as a predicate offense].)

Officer Cook's testimony concerning the murder of Robert Gonzalez by Hernandez's brother was based on hearsay. The testimony was inadmissible under *Sanchez* to prove a predicate offense, but the error is harmless by any standard. There was admissible evidence of three other predicate offenses. The prosecution needed only two.

Almanza argues Cook's hearsay testimony on the murder of Robert Gonzalez was improperly introduced to show motive. Hearsay is evidence of an out-of-court statement that "is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Evidence of motive is not hearsay because it is not offered to prove the truth of the matter stated. The truth of the

7

matter is beside the point. One can be as motivated by an untrue rumor as by a true statement. (See *People v. Valdez* (2011) 201 Cal.App.4th 1429, 1437 [evidence of statements on defendant's social media page showing gang membership not hearsay when used to show motive for killing].)

Almanza argues Cook's identification of Rivas as a gang member was based on hearsay. This error is harmless beyond a reasonable doubt. The People's case did not depend on the identification of Almanza's accomplice or whether he was a member of the Big Hazard gang.

Almanza argues Cook's opinion that Almanza intended to benefit the Big Hazard gang was also hearsay. But Cook's opinion was not hearsay because it was based on a hypothetical question. In posing the question, the prosecutor said: "In my hypothetical, two Big Hazard gang members go to the liquor store at Soto and Alcazar. And they find somebody that has been green lit by Big Hazard. One of the Big Hazard gang members goes into the store and brings this person who has a green light on him -- I'll call that person the victim -- brings the victim outside of the store. And when he gets outside the store, another Big Hazard gang member shoots him."

Cook testified that in his opinion such a shooting would be committed for the benefit of a criminal street gang. Expert testimony based on a hypothetical is approved by *Sanchez*. (*Sanchez, supra*, 63 Cal.4th at p. 685 [a gang expert "can give an opinion based on a hypothetical including case-specific facts that are properly proven"].) Cook's opinion that Almanza intended to benefit the gang was properly admitted into evidence.

The facts of the case lead to the same conclusion. Almanza was a member of Big Hazard. Hernandez had been "green lighted" by the gang. Almanza had no personal animosity

against Hernandez.  They were together at a barbeque and Almanza had just given Hernandez money to buy beer.  There was simply no motive for the killing other than to benefit the gang.  Even without Cook's opinion testimony, the only reasonable conclusion the jury could reach is that Almanza intended to benefit the gang.

II

Almanza contends his confession was involuntary.

Almanza voluntarily went to the police station.  After being advised of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436), he agreed to talk to the police.  The interview was recorded and played for the jury.

Almanza told the detectives he gave Hernandez money to buy beer.  Hernandez left for the store but did not return.  Almanza went to the store to get his money back.  He was leaving when he heard shots.  The police told Almanza the video shows he is lying.  A detective said, "You're probably not gonna go home today if you're lying."

Then Almanza told the police that Minor shot Hernandez.  Almanza denied that anybody sent him to the store to shoot Hernandez.  He said he went of his own accord to get his money back.  The police said Hernandez did not have any cash.  He paid for the beer with a credit card.

Later Almanza denied he knew who shot Hernandez.  After the police questioned Almanza more, he said, "I'm fucked."  When a detective said, "Tell me what you know."  Almanza said, "Regardless, I know I'm -- I'mma stay.  I'm staying."  When a detective asked why he is staying, Almanza replied, 'Because I know I fucked up. . . .  This looks all fucked up, man."

After the police again expressed doubt that Almanza was telling the truth, a detective said, 'You tell me the right things, you're going home."

Almanza denied he knew Hernandez was going to be killed. A detective said, "Even though it makes you look bad, . . . you need to come clean. . . . Because otherwise, it doesn't look good for you." After Almanza acknowledged he had no choice, a detective said, "Because if you don't, you will be fucked."

In an apparent reference to Almanza's position as a paid police informant, a detective said that Almanza had a lot to lose, but he could still save it. A detective told Almanza, "[Y]ou're not under arrest." The following colloquy then took place:

"[Detective:] [Y]ou got people that are gonna take care of you, you know, once all this goes down. You got more to lose than anybody.

"[Almanza:] Exactly. Yes.

"[Detective:] But you have an out, too. I mean, I didn't promise you anything.

"[Almanza:] Yes.

"[Detective:] You know? I mean, you got your thing going.

"[Almanza:] You just want what's going on here. You want the truth from here. That's what you want.

"[Detective:] This is -- this is what you've been kind of paid to do the last few years of your life, you know, working with other entities that have taken care of you. And, you know, you've been honest up to a certain point."

Almanza continued to deny involvement in the shooting. The following colloquy took place:

"[Detective:] Actually, I--I would be more worried about lying and your handlers knowing you're lying, because are they

gonna continue to help you?  I don't know.  Are you ready to go out on your own[?]

"[Almanza:]  No.

"[Detective:]  [W]ith no protection?

"[Almanza:]  No.

"[Detective:]  With no--I--you know, I don't know.  That's--I would be more concerned about that.  It's up to you, man."

Almanza said that he had been lying.  He said, "Little Merico," not Minor, shot Hernandez.  Almanza continued to state he had nothing to do with setting up Hernandez.  Almanza also continued to deny he carried a gun away from the scene.  The detectives told Almanza Little Merico could not have been the shooter.  He got shot.

A detective said, "If you want my help, the bullshit's got to stop."  Later a detective said, "But you're gonna be taken care of if you're being honest."  After the detectives caught Almanza lying again, a detective said, "I really want you to go home tonight."

Almanza then told the detectives Rivas shot Hernandez.  Almanza said that after he got the call telling him to look for Hernandez, Rivas told him he got a similar call.  Rivas told Almanza he wanted to go to his house to "take a leak."  That is when Rivas got his gun.  When a detective asked Almanza whether he knew Rivas had a gun, Almanza replied, "In a way, yes.  In a way, no. . . .  I [have] never known of him doing anything dirty from the neighborhood, sir."  Almanza said that as he was walking out of the store with Hernandez behind him, Rivas walked up and shot Hernandez.  Then Rivas handed Almanza the gun, and Almanza took it to Boris's house.

Almanza filed a motion in limine to suppress the confession as involuntary.  The trial court found the only statements that

11

raised concern were the three statements made about Almanza going home if he told the truth. In denying the motion, the court noted that Almanza arrived at the interview voluntarily; the comments by detectives about going home were ambiguous; and the detectives were not overbearing, rude or threatening. The court concluded Almanza's confession was voluntary.

To be admitted into evidence, a confession must be the product of an essentially free and unconstrained choice. (*People v. Jones* (1998) 17 Cal.4th 279, 296.) The prosecution has the burden of showing that the statements were voluntary by a preponderance of the evidence. (*Ibid.*) The trial court's determination whether coercive police activity was present, whether certain police conduct constituted a promise, whether the conduct operated as an inducement, as well as the ultimate issue of the voluntariness of the confession, are subject to independent review. (*Ibid.*) The trial court's findings as to the circumstances of the confession, such as the characteristics of the accused and the details of the interrogation, are reviewed for substantial evidence. (*Ibid.*)

To render a confession involuntary, there must be not only a promise or threat, expressed or implied, but also a causal connection between the promise or threat and the defendant's statement. (*People v. Perez* (2016) 243 Cal.App.4th 863, 871.) The question is whether a promise or threat caused the defendant's free will to be overborne. (*People v. Tully* (2012) 54 Cal.4th 952, 993.)

Here detectives told Almanza three times that if he told the truth he could go home. They also told him that if he told the truth he could continue as a paid police informant. Otherwise, he would be left with no protection.

12

Almanza's background and sophistication possibly led the trial court to conclude the confession was voluntary. At the time of Almanza's confession, he was 41 years old, a lieutenant in his gang, and had served a prior prison term. He also had served as a paid police confidential informant for over three years prior to his arrest.

A reading of the confession as a whole could well lead to the conclusion that Almanza confessed, not because of promises, but because he knew the police had the evidence against him. Each time he lied, the police confronted him with the surveillance video or other objective evidence showing he lied.

In any event, any error in admitting the confession is harmless beyond a reasonable doubt. Almanza appeared on a surveillance video in the commission of the crime and later sent text messages admitting his complicity. Under the circumstances, a confession is superfluous.

### III

Almanza contends the trial court erred in denying his request for an instruction on voluntary intoxication.

The People's theory at trial was that Almanza was not the shooter but an aider and abettor. Both aiding and abetting and the gang allegation require specific intent. (See *People v. Mendoza* (1998) 18 Cal.4th 1114, 1131; *People v. Albillar* (2010) 51 Cal.4th 47, 67.) Evidence of voluntary intoxication is admissible on whether the defendant actually formed a required specific intent. (§ 29.4, subd. (b).)

Almanza points to evidence that he had been drinking before the shooting. In his interview with the detectives, he said he had about four 24-ounce mixed drinks at the barbeque and was drinking "some beers" at Rivas's house.

But to support a voluntary intoxication instruction, it is not enough to show evidence the defendant had been drinking. There must be substantial evidence that the effect of the drinking on the defendant's mental state was sufficient to negate specific intent. (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1180-1181.)

Here there is no such evidence. In fact, when the detectives asked Almanza whether he was drunk on the day of the shooting, he replied, "I was buzzed. Good buzz. I wasn't 'drunk' drunk." When a detective said, "But you're not drunk where you're doing stupid shit." Almanza replied, "Oh, hell no. Hell no. No. . . . I'm in control."

IV

Almanza contends the trial court erred in not ordering joint and several liability with Rivas for victim restitution.

The trial court ordered Almanza to pay $10,819.50 in victim restitution, but did not include Rivas in the order. Rivas was convicted of the same matter in a separate trial.

But Almanza cites no authority giving the trial court jurisdiction to impose restitution on a person who is not a party to the proceeding. Rivas was a party to a different proceeding. In *People v. Leon* (2004) 124 Cal.App.4th 620, on which Almanza relies, the court imposed restitution on codefendants. Here Rivas was not a codefendant. Almanza was the only defendant in this proceeding.]]

V

On October 11, 2017, the Governor signed Senate Bill No. 620 into law, effective January 1, 2018. The bill amends subdivision (h) of section 12022.53. The amended subdivision provides: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section.

14

The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (§ 12022.53, subd. (h), as amended by Stats. 2017, ch. 682, § 2.)

The People concede that Senate Bill No. 620 is a statute that gives the trial court discretion to impose a lower sentence and applies retroactively. (*People v. Francis* (1969) 71 Cal.2d 66, 75-76.) The People argue, however, that remand to the trial court is not appropriate under the facts of this case because the record shows the trial court "would not . . . have exercised its discretion to lessen the sentence." (*People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896.)

The People point out that the trial court could have imposed concurrent sentences for murder and assault with a firearm. Instead, the court imposed consecutive sentences. Thus, the People conclude the court exhibited no desire to be lenient with Almanza.

Conflicts in the proper application of the law among different courts of appeal may cause uncertainty and doubt for attorneys, their clients and the public. Often these conflicts require resolution by our Supreme Court. But courts of appeal also enlighten one another in developing the law. Our opinion on rehearing offers such an example and the resolution of what could have been a conflict in the law.

In an earlier version of *Almanza*, we affirmed and did not remand to the trial court, so that it could decide whether to strike the enhancement. We reasoned that in light of Almanza's crime of premeditated murder, his record, and his sentence, it would be an idle act to afford the trial court the opportunity to reconsider its sentence.

Shortly after publication of our opinion, our colleagues in the Third District in *People v. McDaniels*, *supra*, 22 Cal.App.5th

15

420 concluded we applied what amounted to an abuse of discretion standard in our decision not to remand, citing *People v. Watson* (1956) 46 Cal.2d 818, 836, and *People v. Scott* (1994) 9 Cal.4th 331, 355. Remand is not necessary when it is not reasonably probable that a more favorable sentence would be applied in the absence of error.

The persuasive reasoning in *McDaniels* prompted us to grant rehearing and request further briefing on the appropriate standard of review. Both the People and defense offered excellent arguments on why remand would or would not be appropriate in this case.

The *McDaniels* court and now we agree on what is the appropriate standard to adopt when a trial court is unaware it has the discretion to reduce a sentence. Remand is required unless the record reveals a clear indication that the trial court would not have reduced the sentence even if at the time of sentencing it had the discretion to do so. (See *People v. Gutierrez*, *supra*, 48 Cal.App.4th 1894.) Without such a clear indication of a trial court's intent, remand is required when the trial court is unaware of its sentencing choices.

In light of the trial court's initial sentence, choosing consecutive sentences instead of concurrent sentences for murder and assault with a firearm, the People argue that the court "clearly indicated" it chose the firearm enhancement to achieve its desired sentence.

We are persuaded, however, by *McDaniels* and defense counsel that speculation about what a trial court might do on remand is not "clearly indicated" by considering only the original sentence. This is the case when there is a retroactive change in the law subsequent to the date of the original sentence that

16

allows the trial court to exercise discretion it did not have at the time of sentence.

We trust the trial court will not be influenced by our previous opinion. We remand so that the trial court may exercise its independent discretion on whether to strike or dismiss the firearm enhancement. (§ 12022.53, subd. (h).) In all other respects, we affirm.

CERTIFIED FOR PARTIAL PUBLICATION.

GILBERT, P. J.

We concur:

YEGAN, J.

TANGEMAN, J.

17

William N. Sterling, Judge

Superior Court County of Los Angeles

_____

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Timothy L. O'Hair, Deputy Attorney General, for Plaintiff and Respondent.