Filed 7/7/22  P. v. Mendez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HERBERT CORNEJO MENDEZ,<br><br>    Defendant and Appellant. | D078710<br><br><br>(Super. Ct. No. INF1301168) |


APPEAL from an order of the Superior Court of Riverside, James S. Hawkins, Judge.  Affirmed.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.


Herbert Cornejo Mendez was deported from the United States to El Salvador in 2013.  When Mendez arrived at the airport in his native

country, he was stopped by a federal agent and Salvadorian police, who were part of a multi-national task force assigned to gather information about gang activity from incoming deportees known to have connections to gangs operating in both countries. In the interview with these law enforcement officers, Mendez confessed to his participation in a murder in Riverside County in 2005 and an earlier murder in Los Angeles. He also provided information about several gang-related crimes in El Salvador.

Thereafter, with assistance from the U.S. government, Mendez was transported to California, where he faced a murder charge for the crime in Riverside. Mendez unsuccessfully moved to suppress his confessions to law enforcement. Ultimately, a jury convicted Mendez of first degree murder with the special circumstance of lying in wait and an enhancement of personal use of a deadly weapon. Mendez was subsequently sentenced to life without the possibility of parole.

On appeal, this court conditionally reversed the judgment on the grounds that the trial court erred by denying the motion to exclude without holding an evidentiary hearing on the voluntariness of Mendez's confessions. On remand, after holding the requisite evidentiary hearing over several days, the trial court found Mendez's confessions were voluntary and the evidence of those confessions was properly considered by the jury, and reinstated the judgment of conviction. Mendez appeals again, asserting the trial court's finding was not supported by substantial evidence. Mendez also contends a subsequent confession he made to the police investigator in the U.S. upon his arrival, and his decision to testify at trial, were tainted by his earlier involuntary confessions, requiring reversal of the trial court's order reinstating the judgment. As we explain, we reject Mendez's arguments and affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

*1. Factual Background and Initial Trial and Appellate Proceedings*

As set forth in this court's earlier opinion, "In early September 2005, a Caltrans worker found the body of Angel Palacios on the side of eastbound Interstate 10, near the Eagle Mountain Road exit in Riverside County.  The body was in an advanced state of decomposition and clothed only in shorts and boxers.  Palacios's last contacts were several telephone calls with Laura Grijalva on August 26, 2005.  He told her that two friends were driving him back to Tucson, Arizona.  Palacios never arrived in Arizona." (*People v. Mendez* (Aug. 22, 2018, D073443) [nonpub. opn.] (*Mendez I*).)  "Palacios had 30 to 40 sharp force injuries, consisting of stabbing wounds, chopping wounds and incised wounds.  The chopping wounds could have been caused by a machete.  Palacios also had three or four blunt force injuries on the top and back of his head, caused with force great enough to depress his skull.  The cause of death was multiple sharp force trauma.  [¶]  Investigators could not find any information about the murder.  The investigation went cold." (*Ibid.*)

Mendez was deported to El Salvador from the United States in 2013, "due to his illegal entry." (*Mendez I*, *supra*, D073443.)  As our earlier opinion explained, "[w]hen deportees arrived in El Salvador, they were held in a room at the airport while facilitators checked for warrants and helped the deportees find family members and transportation." (*Ibid.*)  In addition, "[t]he FBI had a program of gathering information from gang members when they arrived in El Salvador.  FBI agents asked known gang members about the structure of the gang and about unsolved crimes in the United States and El Salvador.  FBI Special Agent Bret Curtis was working in this program in El Salvador when Mendez arrived in 2013." (*Ibid.*)

Curtis was aware that "Mendez was a member of Mara Salvatrucha-13 (MS-13), a gang that operated in both El Salvador and the United States" and "interviewed Mendez at the airport in El Salvador." (*Mendez I*, *supra*, D073443.) "Mendez was not in custody" and "the interviews were not recorded because the agents were gathering information, not interviewing suspects." (*Ibid.*) Curtis "told Mendez there was a possibility of working as an informant for the FBI" and obtaining a visa to return to the United States. (*Ibid.*) In that initial interview, which took place on February 22, 2013, Mendez told Curtis about two murders in California and three in El Salvador. In particular, he discussed his role in killing Palacios and stated that a gang member called "Chorombo" had ordered the killing.

After this interview, Curtis contacted California authorities and eventually connected with Investigator Nelson Gomez of the Riverside Sheriff's Office. Gomez provided Curtis with information about the unsolved murder of Palacios that corroborated Mendez's confession, including photographs and a summary of the investigation.

Curtis then met with Mendez for the second time on March 8, 2013. Curtis picked up Mendez near his sister's home and took him to a nearby police station. Mendez was not under arrest and was free to end their communications. Curtis showed Mendez the photographs provided by Gomez, and Mendez identified Palacios as the man he had helped kill. He also identified another individual, Mauricio Aguilar, as Chorombo. During this second interview, Mendez expressed both his fear of MS-13 and his desire to return to the United States. Curtis told Mendez that he would provide the information to Gomez and find out how the Riverside authorities wanted to proceed. They discussed the possibility of Mendez returning to the

4

U.S. to testify against other gang members involved in the murder of Palacios.

Thereafter, Curtis contacted Mendez again, and arranged for him to be interviewed by Gomez over Skype. During this interview, Mendez confessed his involvement in the killing, and Curtis and Gomez discussed a parole visa for Mendez to return to the United States. Directly after the interview, Curtis took Mendez to obtain a new passport from the Salvadorian government. Thereafter, the FBI provided Mendez with lodging in a hotel and money for food while they waited for Gomez to obtain an arrest warrant. About a month later, the warrant was issued and the FBI gave Mendez an airline ticket to the United States. Mendez was accompanied by FBI officials on the flight and arrested when the plane landed. He was then transported to Riverside County, where Gomez interviewed Mendez again. Gomez advised Mendez of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, Mendez said he understood those rights, and then Mendez again confessed his involvement in the crime.

Before trial, Mendez brought a motion in limine to exclude his confessions, arguing they were involuntary because Mendez feared for his life at the hands of MS-13 if he were to remain in El Salvador. At a pretrial hearing, the district attorney opposed the motion to exclude the confessions, asserting there was no evidence that Curtis had made any promise to Mendez. The prosecutor also explained the visa that was ultimately secured for Mendez was a parole visa, which allowed Mendez to enter the country for the specific purpose of an arrest. Mendez's counsel responded that Mendez confessed because Curtis offered to help him obtain a visa.

After argument, the court denied the motion, finding the confessions were voluntary based on Curtis's documentation that he did not make any

5

promises to Mendez, and the fact that Mendez volunteered the information despite Gomez's repeated assertion that he could not promise Mendez any favorable treatment by prosecutors. At trial, Mendez denied participating in Palacios's murder, and instead claimed that he learned the information about the murder from other gang members. The jury disbelieved Mendez's trial testimony and convicted him of first degree murder. The jury also found true the special circumstance enhancement that Mendez intentionally killed Palacios while lying in wait and that Mendez personally used a deadly weapon—a machete—in the commission of the murder. Thereafter, the trial court sentenced Mendez to life without the possibility of parole.

Mendez appealed the judgment of conviction, asserting reversal was required because "all his statements to Agent Curtis and Investigator Gomez were involuntary because they were induced by Agent Curtis's promise to get him a visa to, and refuge in, the United States after Mendez told the agent that he believed MS-13 would kill him if he remained in El Salvador." (*Mendez I*, *supra*, D073443.) This court, relying on *Jackson v. Denno* (1964) 378 U.S. 368, concluded the trial court erred by failing to hold an evidentiary hearing before determining whether Mendez's confessions to Curtis were voluntary. (*Mendez I*, *supra*, D073443.) We conditionally reversed the judgment for the trial court to conduct such a hearing. (*Ibid.*)

*2. Evidentiary Hearing After Conditional Reversal*

After remand, the trial court conducted the evidentiary hearing directed by this court. Agent Curtis, Mendez, officer Gomez, and a defense expert, Dr. Richard Leo, a professor of law and psychology, testified.

*A. Prosecution's Evidence*

The prosecution called agent Curtis and officer Gomez to recount their interactions with Mendez. During his testimony, Curtis explained his duties

6

in El Salvador that resulted in his initial interview of Mendez, and his involvement in this case. Curtis stated that the FBI would receive information about recently deported gang members with ties to MS-13 and a rival gang, 18th Street. If agents were not busy with other work, they would go to the airport with Salvadorian law enforcement (who together constituted a "Transnational Anti-Gang Task Force") as deportees were arriving and ask them while they waited to be repatriated if they were willing to be interviewed. The interviews were an information gathering tool for law enforcement, and were not targeted to any particular criminal activity.

According to Curtis, the deportees were free to decline to speak with the taskforce agents and could continue repatriation to El Salvador without question. The taskforce members had information about the deportees' involvement with the gangs and at least some of their criminal history. Curtis explained that he would approach a deportee in a large open area, where approximately 50 individuals would be processed for repatriation, and then meet with willing subjects in glass windowed offices that opened to the same area. It was normal for other authorities and deportees to come in and out of the offices during interviews.

Curtis stated that interviewees were not given any benefit for speaking with him at this initial interview. As a matter of course, Curtis would inform them about becoming an FBI source, explaining they could be paid by the U.S. government if they were able to provide helpful information. Curtis also told them if "there was value to bringing them back to the United States, [the FBI] could help them get travel documents so that they could come to the United States and work with the FBI."

Curtis testified that the day Mendez arrived in El Salvador, he was given Mendez's name as a potential source and member of MS-13 who was

being deported from the U.S. Curtis and two other Salvadorian task force officers were in the room with Mendez during this first airport interview on February 22, 2013. The interview was conducted in Spanish and, in accordance with FBI policy at that time, was not recorded. Curtis was unarmed and was not in uniform or in a suit during the interview. The Salvadorian officers were carrying concealed handguns.

Curtis told Mendez that individuals could be paid if they provided accurate, helpful information to the FBI and that, if they were needed to help the FBI's investigation, the FBI might help them return to the U.S. legally. Curtis testified he did not make any promise to Mendez that he would become an FBI source, be paid just for speaking with the FBI, or that he would send Mendez back to the U.S. if he provided information. Curtis recalled that during the initial interview, Mendez said his sister had told him about the witness protection program and he asked about becoming part of that program. Curtis responded only that he would look into it.

Curtis testified that Mendez told him and the Salvadorian authorities about three murders in El Salvador, and the two murders in California. Curtis stated Mendez never refused to answer questions or give details, either before or after Curtis explained the process for becoming an FBI source and the potential opportunity to return to the United States. Curtis was not aware of any of these homicides before speaking with Mendez. Curtis stated that at this initial meeting in the airport, Mendez confessed to his participation in killing Palacios, and gave the agent details regarding his involvement. After the interview, one of the task force officers told Curtis that one of the El Salvador crimes was a well-known homicide.

Curtis said he did not remember Mendez expressing any concern about his safety during this first interview, but Mendez did make clear he wanted

8

to return to the U.S. Curtis testified that he did not promise anything to Mendez and said he concluded the interview, which lasted one to two hours, by telling Mendez he would look into the information Mendez provided to determine its validity. They exchanged phone numbers and arranged to meet the following week.

After the initial interview, Curtis contacted the Riverside County coroner to see if any homicides matched the information that Mendez provided. He was eventually put in contact with Gomez, who sent him a photo of Palacios and a summary of the unsolved murder investigation. The task force members determined the identity of Chorombo and Curtis obtained a photograph of him. Curtis then met with Mendez for the second time on March 8, 2013. Curtis picked Mendez up in his armored, unmarked Toyota 4-Runner near Mendez's sister's home and took him to a nearby Salvadorian police station. Curtis testified that Mendez was not handcuffed, and was not under arrest at the time of the second interview.

During the interview, Curtis showed Mendez the photographs of Palacios and Chorombo and Mendez identified both men. Mendez told Curtis for the first time that he feared MS-13 and repeated his desire to return to the U.S. Curtis said that Mendez again confessed to his participation in the killing of Palacios. In his testimony, Curtis said he made it clear to Mendez that he could not make any promises about helping him return to the U.S., but that we would speak with the Riverside authorities to "find out what they wanted to do."

Curtis testified that after the March 8th interview, he spoke with Gomez, who told Curtis they would obtain a warrant for Mendez's arrest. Curtis also spoke with the U.S. Department of Justice (DOJ), who informed Curtis to tell Mendez he would be arrested if he returned to the U.S. Curtis

9

began working with the DOJ to obtain a significant benefit parole visa to return Mendez to the U.S. and to help Mendez obtain a valid passport.

Between March 8th and March 14th, Mendez agreed to an interview with Gomez. Curtis could not recall the exact date he first told Mendez he would be arrested for his involvement in the Palacios murder, but he stated he and Gomez informed Mendez on March 14, 2013, the date of the Skype interview with Gomez, that if he returned to the U.S. through this avenue, he would be arrested upon his arrival in the U.S. Curtis testified that when Mendez asked how much time he would serve and whether he could remain in the U.S. after his arrest, Curtis told Mendez he did not know and that it would depend on the California authorities.

On March 14, 2013, Curtis picked up Mendez in the same location near his sister's home and took him to a hotel for the Skype interview, which was recorded, with Gomez. Curtis testified that after the interview he took Mendez to the immigration office and paid the fees for Mendez to obtain his passport. Curtis stated that at this time, Mendez knew that returning to the U.S. with Curtis's help would result in his arrest by California authorities when he arrived. After obtaining the passport, Curtis told Mendez that he was continuing to work on the parole visa, which would allow Mendez to travel to the U.S. They parted ways, and thereafter kept in contact by phone.

Curtis testified that on April 18, 2013, Mendez called Curtis and said that he could not wait any longer to return to the U.S. Mendez feared that his family was in danger if he remained at his sister's home and told Curtis that if Curtis could not get him to the U.S. in the next 15 days, he would travel there illegally as he had done in the past. As a result, the FBI furnished Mendez with a hotel room while the visa documents were continuing to be processed.

10

Mendez stayed at the hotel until the parole visa was issued on May 16, 2013. That day, Curtis transported Mendez to the airport where he was accompanied by federal agents on a flight to Los Angeles. Curtis testified that Mendez was not in custody, was not handcuffed, and was free to leave at any point prior to boarding the plane. Upon his arrival in Los Angeles, Mendez was taken into custody by Riverside authorities.

In his testimony, officer Gomez confirmed what Curtis described about the investigation after Mendez's initial confession at the airport. Gomez also testified that Curtis told him that he had not made any promises to Mendez, and that Mendez volunteered the information at an "interview that was conducted [that] was more of a debrief as to what information the individual could provide in reference to MS-13."

Gomez testified that after confirming the information provided to him by Curtis, he arranged for the recorded Skype interview. Gomez said he did not give a *Miranda* warning because Mendez was not in custody. The transcript of the interview was admitted into evidence at the hearing.

In the Skype interview, Gomez first explained to Mendez that he had been told that Mendez had information about a murder in Riverside County in 2005. Mendez then told Gomez how he knew Palacios, described the events leading up to his murder, then described how he and two gang members drove Palacios to Riverside County and killed him with a machete. Mendez again admitted, in graphic detail, his personal involvement in killing Palacios. Mendez told Gomez additional details about the murder and the other participants, and said he had no contact with the others after 2005, and that he was deported from Texas to El Salvador in January 2006. Mendez said he reentered the U.S. in May or June of that year and had lived in

11

Houston since that time, except for his second deportation and reentry in 2011 following an arrest in Kingsville, Texas.

Mendez told Gomez he wanted to return to the U.S. because the gang wanted to kill him for failing to report in as required after his 2006 deportation. Gomez said that he had to speak to the district attorney to see what he could do for Mendez, but that he could not promise anything. Gomez also acknowledged Mendez was considering reentering the country illegally and gave Mendez his phone number so that he could contact Gomez. Gomez reiterated that he could give no guarantees about what would happen to Mendez. Mendez told Gomez he knew that what he did was wrong and that it was the reason he left the gang; he told Gomez that Palacios was his friend and he did not want to kill him.

After confirming details about the killing, Gomez asked Mendez if he had questions. Mendez asked Gomez if he would "have to pay with jail time" if he was brought back to the U.S. and Gomez told him that was a possibility. Gomez told Mendez that if he helped the district attorney there was a chance of more lenient treatment, but no guarantee. Gomez also told Mendez, "[Y]ou understand that maybe there is a chance that you know, there is going to be a little bit that I can do for you." Mendez responded, "That is, you are practically telling me that I could also end up paying with jail time over there." Gomez then told Mendez it would depend and that "if you keep helping, maybe, maybe, I can't tell you yes or no." Mendez again asked Gomez if he would be "paying with jail," and Gomez said he would have to talk to the district attorney. Gomez then told Mendez he would speak with Curtis and make some phone calls to see what he could do. When Gomez asked Mendez if he wanted to make himself a witness, Mendez responded yes. The Skype interview lasted a little over 43 minutes.

12

After the interview with Mendez was complete, Curtis told Gomez he was working on helping Mendez obtain a passport, and Gomez said he would be working with the district attorney to determine the next steps in the U.S. Gomez also testified he told Curtis he would complete his investigation and follow up with the Los Angeles authorities about the other murder Mendez had provided information about before passing the case onto the district attorney.

Thereafter, Gomez completed his investigation and met with the district attorney, who decided to file an arrest warrant for Mendez for the murder of Palacios. Gomez notified Curtis that the warrant had been issued. Gomez was not involved in the planning to bring Mendez to the U.S., but understood that because the U.S. did not have an extradition treaty with El Salvador, Mendez would have to return to the U.S. voluntarily.

After his arrest in Los Angeles, Mendez was transported to a sheriff's station in Riverside. Gomez met him there and conducted a recorded interview, which was submitted as evidence at the hearing. Gomez read Mendez his *Miranda* rights in Spanish,[1] and Mendez stated he understood each right. Mendez again provided detailed information about the killing of Palacios and his interactions with the victim and the other gang members involved in the murder.

When asked about his motivation to confess, Mendez said his family did not have the money to send him back to the U.S. illegally and he feared the gang in El Salvador. Mendez also stated that Curtis told him he would see if he could help Mendez stay in the U.S., but then later Curtis said he could not help Mendez. Gomez pointed out that Mendez had the choice to stay in El Salvador, and face the gang there, or come to the U.S. to face the

---

[1]     Gomez was of El Salvadorian descent and a native Spanish speaker.

13

chance of incarceration. In response, Mendez said he felt bad for the killing because Palacios was his friend. When Gomez asked Mendez if he was willing to testify against the others, Mendez responded that that was why he was brought here. Gomez then told Mendez he could not make any guarantees and that he would have to discuss the matter with the district attorney before any decisions could be made.

Later during the interview, Mendez told Gomez he sometimes woke up screaming at night and did not feel well all the time and that he "wanted to get out on one part and the other, [Curtis] told me they were going to help me and I don't know what." In response, Gomez reminded Mendez that he told him during the earlier Skype interview that he could not make any promises and any decision about what would happen was up to the district attorney. Mendez stated that Curtis had changed his mind about being able to help him and expressed concern for his family members' safety. Gomez repeated that any decision would be made by the district attorney. The recorded custodial interview lasted two hours, seventeen minutes.

*B. Defense Evidence*

The defense called Mendez and an expert on police interrogations and psychological coercion, Dr. Richard Leo. Mendez began his testimony by describing his family in El Salvador and where he had grown up. He stated he left school after the seventh grade because of gang violence. Mendez joined the MS-13 gang for protection after his mother moved to the U.S. when he was 14 years old. Mendez was arrested in El Salvador for gang activity and has tattoos that identify him as a member of MS-13.

Mendez first crossed into the U.S. illegally when he was 21 years old. He testified he did so to escape MS-13, but when he arrived in Los Angeles he was contacted by a cousin involved with the gang and began selling drugs in

14

North Hollywood with other MS-13 members. He left Los Angeles for Texas in November 2006 after the killing of Palacios, to get away from the gang. Not long after, in 2007 he was deported back to El Salvador. Mendez testified that a week after he arrived, he was kidnapped and held for several days by gang members for failing to check in with MS-13. Mendez said during this time, he learned about the murder of Palacios from other MS-13 gang members. Mendez said he escaped the gang five or six days later when he was arrested for gang activity. He testified that when he was kidnapped the gang told him he had 13 days to kill three people, or he would be killed. Mendez never checked in with the gang in El Salvador again.

Shortly after, Mendez illegally crossed into the U.S. a second time.[2] Mendez lived in Texas and worked in construction until a second deportation in 2011 after he was arrested by immigration authorities in 2010. After the arrest, Mendez testified that he remained in the custody of immigration authorities while he sought political asylum based on his fear of the Salvadorian gang. He stated he was not able to obtain asylum because he had no documentation to establish the veracity of the threats he alleged were made against him by MS-13.

After the second deportation, in November 2011, just a week after arriving in El Salvador, Mendez began the journey to enter the U.S. illegally a third time. Once he arrived, Mendez again lived in Texas, working construction and living with his girlfriend. Mendez's mother and sister also lived nearby. A year and two months later, Mendez was pulled over by the police and given a traffic ticket. After he failed to pay, he was arrested and

---

[2] In his testimony, Mendez, assumingly in error, says he returned to the U.S. in 2006.

15

eventually turned over to immigration authorities and deported for the third time. Upon his arrival in El Salvador, Mendez met Curtis.

Mendez testified that when he landed, a Salvadorian police officer called his name and directed him to an office where Curtis and two other Salvadorian police were waiting. Mendez said he thought he was required to talk with the men. Mendez stated that Curtis introduced himself as an FBI agent that dealt with victims and witnesses from El Salvador. Mendez testified that Curtis told him they knew he was an MS-13 member and asked him to provide any information to help solve crimes in the United States or El Salvador. Mendez elaborated that Curtis told him he could pay for any information Mendez provided, but Mendez said he told Curtis money was worth nothing to him in El Salvador because he "was going to get killed" by MS-13.

Mendez testified that he told Curtis MS-13 was looking for him to kill him and that Curtis said if he provided information that led to an arrest for a crime, that he would bring Mendez to the U.S., and that he could get him a green card and a Social Security card. Mendez stated that he understood Curtis to be saying that if he gave Curtis information, Curtis would help him stay in the U.S. legally. Mendez also testified that after he gave Curtis details about a homicide that MS-13 committed in Los Angeles, Curtis wanted to know what Mendez's role was in the murder. According to Mendez, when he told Curtis he had only heard about the crime, Curtis said the information was not enough for him to obtain a visa and that Curtis said Mendez either had to be a participant or actually present during the homicide in order qualify for assistance.

Mendez said he then told Curtis about the Palacios killing and also provided information about crimes in El Salvador. Mendez told the court he

16

lied to Curtis about participating in the murder because he thought it was the only way to get a visa. He stated he heard about the murder from other MS-13 gang members who shared the details with him. Mendez stated that Curtis told him that he needed to verify the information, but if he did, and a crime could be solved, Mendez would become a witness in the U.S.

As Curtis had testified, Mendez said that after the airport interview, he stayed in contact with Curtis by telephone. Mendez added that during these calls he told Curtis his life was in danger by remaining in El Salvador. Mendez also said he told Curtis that if he could not help, he was going to go to Guatemala and try to return to the U.S. on his own. He testified he actually went to Guatemala before the next interview "to see what the situation was to cross over to here."

Mendez also testified that during that subsequent interview at the Salvadorian police station, Curtis asked him why he would risk an illegal crossing when Curtis could help him enter legally. Mendez stated that Curtis told him about secure programs for witnesses. Mendez elaborated that Curtis told him the FBI was closing down safe houses in the U.S., but that if Mendez gave Curtis the address of a family member where he would be staying in the U.S., an agent would check on him once a month or once every 15 days. Mendez also testified that Curtis told him there was a chance he would be arrested when he came to the U.S.

After the second interview, Curtis told Mendez the next step in the process of obtaining a visa was a follow-up interview with a U.S. detective. Mendez said he and Curtis stayed in contact by phone, and Mendez reiterated his fears about staying in El Salvador but that Curtis told him everything was going well with the visa and not to worry. Mendez also testified that before the Skype interview with Gomez, Curtis told him "to

17

continue saying the same things I mentioned to him the first time around." As Curtis had testified, Mendez said that after the interview with Gomez, Curtis helped him get a new passport, and that while he waited for documents, he stayed at a hotel paid for by the FBI for a month. Mendez testified he stayed in the hotel because his family was afraid to have him near since he planned to testify against the gang. Mendez said he believed he was going to the U.S. to testify and then be able to live freely in the U.S. He said he was never told he would be charged with murder.

Mendez testified that on the day of his flight, Curtis drove him to the airport but kept his passport and other documents until just before check-in. Curtis told him he would have to repeat his story when he arrived in the U.S., or he would lose his visa. Mendez also testified that Curtis told him there was a chance he would be put in jail and that he should report to the gang and give Curtis any additional information he obtained about MS-13 activity. Mendez said Curtis also told him that when he arrived, he would be placed in a safe house and his name would be changed. Mendez told the court he would never have given a story about the Palacios murder to Curtis or Gomez if he had not been promised a visa to the U.S. He would have "said anything for a chance to come to the U.S. legally."

During his testimony, Mendez stated several times that he feared being killed by MS-13 for not following the order they had given him after his kidnapping in 2006. Mendez admitted, however, that he had no contact with the gang after that alleged kidnapping. He stated that he wanted to return to the U.S. when he spoke to Curtis the first time and did not care how it happened. Mendez also testified he did not feel like he was in danger during his initial interview, but he had the idea that MS-13 wanted to kill him in the back of his mind.

18

Mendez admitted during cross-examination that during the Skype interview, Gomez told him both that Gomez had to meet with the district attorney before anything could happen and that Mendez might serve jail time. Mendez also stated that Gomez did not say he would bring Mendez to the U.S., that only Curtis told him this. Mendez testified that when he got onto the flight to the U.S. he knew he could serve jail time, but he did not think he would be arrested right away.

As noted, the defense also called a professor of law and psychology, Dr. Leo, to testify as an expert on police interviews and interrogations, and on coercion. Dr. Leo testified that a subject who repeatedly indicates his desire to seek refuge in another country based on fear of remaining in his home country might be coerced into providing information to a law enforcement officer who offers to provide such refuge. Dr. Leo also stated that whether an inducement has a coercive effect depends on the context, as well as the understanding of the individual who provides the information.

*C. The Trial Court's Ruling*

After closing statements by counsel, the trial court ruled from the bench. The court first noted that there was no question that Mendez wanted to return to the U.S. when he met Curtis, and that Mendez had a level of sophistication with respect to the legal system as a result of his prior arrests and deportations. The court also noted that when Mendez offered his initial confession to Curtis at the airport, Curtis had no idea that Mendez was going to provide such information. Rather, Curtis was engaging in routine, non-custodial information gathering, in a location that was public.

The trial court credited Curtis's testimony and found he had not made any express or clearly implied promises of leniency. The court further found it not credible that Mendez expected to confess to a murder, return to the

19

U.S., and not face any legal consequence. The court also discounted Mendez's fear based on his admission that he had no contact with the gang since 2006, seven years before his initial interview with Curtis. Referring to this court's prior opinion, the court concluded that "Mendez was not induced by promises such that his free will was overborne" and reinstated the prior judgment of conviction.

Mendez timely appealed from the trial court's order.

DISCUSSION

I

*Governing Law*

" 'Both the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial.' ([*People v.*] *Linton* [(2013)] 56 Cal.4th [1146], 1176 [(*Linton*)].) In *People v. Tully* (2012) 54 Cal.4th 952 (*Tully*), the California Supreme Court described the law governing the determination of whether a confession is involuntary because it was obtained pursuant to an express or implied promise of leniency from law enforcement officers: ' "In general, a confession is considered voluntary 'if the accused's decision to speak is entirely "self-motivated" [citation], i.e., if he freely and voluntarily chooses to speak without "any form of compulsion or promise of rewards. ..." [Citation.]' [Citation.] However, where a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law." ' (*Tully, supra*, at p. 985.)" (*People v. Perez* (2016) 243 Cal.App.4th 863, 871 (*Perez*).)

"The *Tully* court explained the requisite causal connection between the promise and the confession as follows: ' "A confession is 'obtained' by a

20

promise within the proscription of both the federal and state due process guaranties if and only if inducement and statement are linked, as it were, by 'proximate' causation. ... The requisite causal connection between promise and confession must be more than 'but for': causation-in-fact is insufficient." [Citation.] "This rule raises two separate questions: was a promise of leniency either expressly made or implied, and if so, did that promise motivate the subject to speak?" [Citation.] To answer these questions " 'an examination must be made of "all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." ' " ' " (*Perez, supra*, 243 Cal.App.4th at p. 871, quoting *Tully, supra*, 54 Cal.4th at pp. 985–986.)

" ' "A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' [Citation.] The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' " ' " (*Linton, supra*, 56 Cal.4th at p. 1176.) " 'A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked." ' " (*Ibid.*) Critically, " '[a] confession is not rendered involuntary by coercive police activity that is not the 'motivating cause' of the defendant's confession.' " (*Ibid.*)

" 'Insofar as a defendant's claims of involuntariness emphasize that defendant's particular psychological state rendered him open to coercion, [the California Supreme Court] has noted that "[t]he Fifth Amendment is not 'concerned with moral and psychological pressures to confess emanating from

21

sources other than official coercion.' " ' " (*Linton, supra*, 56 Cal.4th at p. 1179, quoting *People v. Smith* (2007) 40 Cal.4th 483, 502 (*Smith*).) Further, " ' " '[w]hen the benefit pointed out by the police ... is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made." ' " (*Tully, supra*, 54 Cal.4th at p. 993.)

" 'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.] In determining whether a confession was voluntary " '[t]he question is whether defendant's choice to confess was not "essentially free" because his [or her] will was overborne.' " [Citation.] Whether the confession was voluntary depends upon the totality of the circumstances. [Citations.] ' "On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review.' " ' [Citations.] ' "[W]hen a reviewing court considers a claim that a confession has been improperly coerced, if the evidence conflicts, the version most favorable to the People must be relied upon if supported by the record." ' " (*Tully, supra*, 54 Cal.4th at p. 993.)

## II

### *Analysis*

Mendez contends substantial evidence did not support the trial court's determination that his confessions were voluntary because "undisputed evidence show[s] the motivating cause of [his] decision to tell Curtis about his involvement in Palacios'[s] murder was his fear that MS-13 would kill him if he remained in El Salvador and Curtis's implied promise that [Mendez] could legally return to the" U.S. We disagree. Mendez did testify that he believed

22

he would be killed by MS-13 if he remained in El Salvador and that he was motivated by this fear to cooperate with Curtis. Critically, however, there is no evidence showing that Curtis exploited this information in an unconstitutional manner to obtain a confession from Mendez.

A

*Curtis Made No Implied or Express Promise of Leniency*

First, Curtis's testimony was clear that he did not make any promise, explicit or implied, to Mendez that he would receive leniency for information he provided. Rather, Curtis testified that when he met Mendez he told him in general terms that the FBI paid informants for information about crimes committed by MS-13 and that informants could be brought back to the U.S. to assist with the investigation of crimes here. Curtis stated that during his initial interview at the airport and in his later interactions with Mendez, the only benefit he told Mendez he could provide was the potential to be brought to the U.S. as a witness. While Mendez partially refuted this version of the interview on the stand—instead stating he understood that if he gave Curtis information, Curtis would help him stay in the U.S. legally—the trial court credited Curtis's version of their interactions over Mendez's. It is not this court's role to revisit that credibility determination. (See *Tully, supra*, 54 Cal.4th at p. 993.)

*Tully* provides a helpful comparison. There, the defendant claimed law enforcement promised he would be placed in the witness protection program if he spoke with investigators. At the evidentiary hearing on his suppression motion, the defendant testified "his family's participation in the witness protection program was the 'key part' in his decision to talk to police. He also testified that the police told him unless he cooperated his wife would go to jail … and his children would be placed in foster homes." (*Tully, supra*, 54

23

Cal.4th at p. 989.)  The interrogating officers, who also testified, denied making such threats.  (*Ibid.*)

The Supreme Court rejected the defendant's assertion that the evidence showed he was promised leniency.  Rather, one of the testifying officers stated the defendant (and his wife) were told that "if they were being truthful, they might qualify for witness protection, but the final decision would be made by the district attorney."  (*Tully, supra*, 54 Cal.4th at p. 994.) Additionally, the "defendant's own testimony fell short of asserting that explicit promises were made to him by the police about witness protection." (*Ibid.*)  The court held that "[t]o the extent there was conflict in the evidence about whether the police promised defendant protection, the trial court resolved it in favor of the prosecution."  (*Ibid.*)  Because the record provided substantial evidence in support of that finding, the higher court was bound by it.  (*Ibid.*)  The court further concluded that the evidence showed "only that defendant was told if his statement was truthful and he otherwise qualified, he and his family could be placed into a witness protection program if the district attorney approved.  Therefore, the police did no more than permissibly point out a possible benefit that might accrue from his ' " 'truthful and honest course of conduct.' " ' "  (*Ibid.*)

The same reasoning applies here.  As in *Tully*, the trial court resolved the conflicting testimony in favor of Curtis.  Because Curtis's testimony was that he told Mendez he could *potentially* qualify for a visa to return to the U.S. as a witness and that he would look into what help might accrue from Mendez's cooperation, sufficient evidence supported the trial court's determination that no express or implied promise of leniency was improperly made to Mendez.  As in *Tully*, Curtis "did no more than permissibly point out a possible benefit that might accrue" from Mendez's honesty.  (*Tully, supra*,

54 Cal.4th at p. 994; see also *People v. Boyette* (2002) 29 Cal.4th 381, 412 [affirming trial court's determination that defendant was not a credible witness and that his assertion the police promised him leniency was not believable] and *People v. McWhorter* (2009) 47 Cal.4th 318, 357 (*McWhorter*) [" 'when a reviewing court considers a claim that a confession has been improperly coerced, if the evidence conflicts, the version most favorable to the People must be relied upon if supported by the record' "].)

Mendez also argues that he was deceived by Curtis because Curtis did not make clear that he would be charged with murder and face life imprisonment. Unlike a confession obtained during a custodial interrogation, however, Curtis was under no obligation to inform Mendez he would face criminal charges. (See *People v. Mickey* (1991) 54 Cal.3d 612, 648 ["Absent 'custodial interrogation,' *Miranda* simply does not come into play."].) Curtis's testimony established (and Mendez does not dispute) that Mendez was not under arrest at the time of the interview and was under no obligation to speak with Curtis or the other task force members. Mendez was free to go at any time. Unlike a custodial interrogation, Curtis's failure to explicitly state Mendez could face criminal charges is just one factor for the court's

25

consideration.  The trial court's finding that this factor did not render the confession involuntary is supported by the record evidence.[3]

B

*There Was No Casual Connection*

*Between Mendez's Fear and Curtis's Conduct*

In addition, there is not a sufficient causal connection between the fear Mendez had of MS-13, which he asserts motivated his confession, and the conduct of law enforcement.  The fact that Mendez was deported and upon arrival in El Salvador feared retribution by the gang, does not show that law enforcement's conduct caused him to confess to involvement in multiple murders, including the killing of Palacios.  The constitutional prohibition on the use of a confession obtained by fear of violence does not arise from " ' "pressures to confess emanating from sources other than official coercion." ' " (*Smith, supra*, 40 Cal.4th at p. 502.)  While it is certainly possible Mendez believed his life was in danger if he remained in El Salvador, this cause of his decision to confess cannot be attributed to Curtis or any other law enforcement actor.  (See *People v. Fayed* (2020) 9 Cal.5th

---

[3]    Relying on *People v. Jimenez* (1978) 21 Cal.3d 595, Mendez also argues that the court's disbelief of Mendez alone was insufficient to find Curtis did not improperly promise Mendez leniency.  This argument is not a fair representation of the record.  Curtis did not testify he could not recall whether he made any promise of assistance.  Rather, he specifically denied doing so.  This is not a case, like *Jimenez*, where the prosecution failed to meet its burden of proof by relying solely on the interrogating officer's statement that he did not *recall* making any promise, rather than affirmatively providing contradicting evidence.  (*Id.* at p. 612.)  As discussed, Curtis testified that he did not make any promise to Mendez.  Rather, he told Mendez in general terms that if Mendez could provide information about criminal gang activity in El Salvador or the U.S., Mendez could potentially become a paid informant or obtain a visa to return to the U.S. to testify.  On these facts, *Jimenez* does not support reversal.

26

147, 166 ["If the ' "decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." ' "]; *McWhorter, supra,* 47 Cal.4th at p. 347 ["coercive police activity is a necessary predicate to establish an involuntary confession" that is "extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence"].)

Curtis, who had no prior knowledge of the Palacios murder, testified that he did not remember Mendez telling him he feared for his safety at their initial meeting. Curtis did recall Mendez expressed fear for his own well-being and that of his family after he began cooperating with Curtis and later Gomez. But in response to this information, Curtis did not make any promise of assistance or protection. Rather, he told Mendez that he would attempt to verify the information that Mendez provided and work with law enforcement in California to determine if he would be eligible for a visa. Curtis then undertook efforts, that were ultimately successful, to accomplish this. When Mendez asked about witness protection, Curtis said only that he would look into it. In addition, Mendez admitted he had not had any contact with the gang since 2006 and provided no evidence showing he or family members had recently been threatened by the gang.

On this record, sufficient evidence supported the trial court's rejection of Mendez's claim that Curtis used his knowledge of Mendez's fear of retribution to extract a confession by offering him safety. Instead, the court concluded, and the evidence showed, that Mendez was desperate to return to the U.S. by any means, including illegally crossing the border again or cooperating in the investigation of multiple murders in which he was a participant. Even if this desperation was to avoid gang retribution, we agree

27

with the trial court that the prosecution established that Mendez's decision to confess was not the product of coercion by Curtis.[4]

## C

### *Mendez's Confession Was Not Otherwise Coerced*

Finally, we agree with the Attorney General that none of the other circumstances Mendez points to in his briefing show insufficient evidence supported the trial court's determination his confessions to Curtis were voluntary. At the time of his third deportation, Mendez was 29 years old. Although he did not attend school past the seventh grade, there is no evidence Mendez is intellectually disabled or of low intelligence. (See *People v. Mendez* (2019) 7 Cal.5th 680, 699.) As the trial court noted, he had knowledge of both the U.S. criminal justice and immigration systems.

With respect to the conditions of the interviews, the first interview with Curtis took place in an office with glass windows that was accessible to others

---

[4] Unlike *Arizona v. Fulminante* (1991) 499 U.S. 279, on which Mendez relies, there was no evidence in the trial court of any specific threat of physical violence that Mendez could escape only by confessing. In *Fulminante*, an inmate suspected of killing a young girl was purposefully befriended by another inmate working as an informant. (*Id.* at p. 283.) The informant, with encouragement from the FBI, repeatedly asked the defendant if he had killed the girl and he repeatedly denied any involvement in the crime. The informant then told the defendant he knew he was in danger from other prisoners because they thought he killed a child, and said he could protect the defendant, but only if he confessed to the killing. (*Ibid.*) The state court found the informant's comments amounted to "a credible threat of physical violence unless [the defendant] confessed." (*Id.* at p. 287.) The U.S. Supreme Court accepted the state court's findings that "there was a credible threat of physical violence" and that the defendant's "will was overborne in such a way as to render his confession the product of coercion." (*Id.* at p. 288.) Here, no evidence showed that Mendez faced an imminent, credible threat of violence at the time he confessed to participating in Palacios's killing or that Curtis demanded a confession to a crime in exchange for protection.

in the waiting area. Curtis testified that immigration officials and other deportees routinely passed through the office during these types of interviews. Further, Mendez was not handcuffed, and could eat and drink and use the restroom as needed. Curtis was not in uniform and was unarmed, and although the Salvadorian task force members were carrying handguns, they were not visible. The interview was conducted in Mendez's native language of Spanish and the interview was not particularly long; lasting one to two hours. (See *People v. Battle* (2021) 11 Cal.5th 749, 791 ["The entire process was not particularly long, totaling between three and three and a half hours. There were breaks during the interview and [the defendant] was given water. … These circumstances of the interview … buttress the trial court's conclusion that [the defendant's] statements to [the investigator] were voluntary."]; *People v. Mendez, supra*, 7 Cal.5th at p. 699 ["As for the interrogation itself, it started just after 8:00 p.m. and concluded shortly after 11:00 p.m. During that period, [the defendant] was allowed to use the restroom and offered food."]; *People v. Wall* (2017) 3 Cal.5th 1048, 1067 ["The interrogation itself lasted less than two hours, not an inordinately long period."].)

Curtis's second interview with Mendez also took place in a noncustodial setting. Curtis picked appellant up near his sister's home and took him to a nearby police station. Mendez was not handcuffed and was not under arrest. Finally, Mendez was under no obligation to continue to meet with Curtis and was free to cut off communications at any time.

In sum, the evidence concerning the setting and circumstances of the interviews with Curtis supported the trial court's determination that Mendez's free will was not overborne. Further, nothing about Mendez's personal characteristics suggested he was prone to confess involuntarily.

29

Because Mendez's statements were not induced by promises such that his free will was overborne, the trial court's determination of voluntariness is affirmed.[5]

## DISPOSITION

The order reinstating the judgment of conviction is affirmed.


McCONNELL, P. J.

WE CONCUR:


AARON, J.


DATO, J.

---

[5] Mendez does not argue that his confessions to Gomez should be excluded independently of his earlier confessions to Curtis. Rather, he contends they were tainted by the earlier confessions, rendering them inadmissible. Because we uphold the trial court's finding that the confessions to Curtis were voluntary, we do not reach Mendez's argument that his subsequent confessions to Gomez were inadmissible fruit of a coerced confession. (See *Mendez I, supra*, D073443 ["If the trial court concludes after a full hearing that Mendez was not induced by promises such that his free will was overborne, the judgment may be reinstated."].)